LAW OFFICE OF
# MICHAEL K. BACHRACH

224 WEST 30TH STREET, SUITE 302
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 • FAX. (866) 328-1630

MICHAEL K. BACHRACH *
\* admitted in N.Y., MN and D.C.

http://www.mbachlaw.com
michael@mbachlaw.com

May 15, 2025

**By ECF**

The Hon. J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

*Re: United States v. Rafael Alvarez,*
*24 Cr. 221 (JPO)*

**DEFENDANT'S SENTENCING MEMORANDUM**

Dear Judge Oetken:

I, along with Richard H. Rosenberg, Esq., represent Defendant Rafael Alvarez in the above-referenced matter. Together with mitigation specialist Muriel Bell, LMSW, we submit this letter for Your Honor's consideration. After reviewing the facts set forth below, as well as the letters submitted on Mr. Alvarez's behalf, it is respectfully requested that this Court fashion a fair and just sentence that complies with the purposes of sentencing.[1] To that end, it is respectfully suggested that this Court sentence Mr. Alvarez to a non-Guideline sentence of one-year-and-one-day imprisonment, or whatever is the most lenient sentence that Your Honor believes appropriate for Mr. Alvarez in this case.

## I.    Introduction

Rafael Alvarez ("Rafael"[2]) comes before this Court with hat in hand, cognizant of his mistakes, accepting full responsibility for his conduct. While in no way meaning to diminish the severity or wrongfulness of his crimes, Rafael's intent was not primarily driven by the desire to enrich himself, though that was certainly a byproduct. Rafael never intended to cause harm. Though misguided, what motivated him was a desire to help the poor in his community, for

---

[1]    Attached as "Exhibit A" are letters from Mr. Alvarez's family and friends; specifically, Gladys Alvarez (wife), Ana Ventura (sister), Giselle de la Cruz (sister), Anamil Ventura (niece), Jorge Gautreau (friend), Robert Lizardo (friend), Victor Morisete-Romero (friend), Vladimira Acosta (friend), Fernando Penñte (friend), and Isioma Ogbue (friend).

[2]    We will be referring to persons throughout this memorandum by their first names to avoid confusion given that many share the same last name. We mean no disrespect to those individuals, nor this Court, by doing so.

whom every dollar saved provides a lifeline. As the pages that follow will describe, Rafael's life has value, and brought value to others, in a manner far distinct from the mathematical equations that drive the recommended Guidelines in this case.

To help this Court determine a sentence that takes into account the facts and circumstances of the crimes charged balanced against the history and characteristics of the defendant, the pages that follow hope to show that Rafael is much more than the worst moments of his life. We respectfully submit that the sentence Rafael receives should be countenanced by an understanding of the man that stands before the Court today – humbled, remorseful, but not without pride for his many positive accomplishments. Indeed, his generosity and kindness has moved many in his community to write letters on his behalf, all echoing their belief in his ability to redeem and truly rehabilitate himself – a potential that is already proving true.

## II.    Offense and Conviction

Rafael owned and operated ATAX New York, LLC, an accounting firm which provided tax consulting, primarily to residents of Washington Heights, Marble Hill, and Riverdale, in upper Manhattan and the Bronx. Much of his work, and his company's work, was lawful, but obviously not all of it. On December 17, 2024, Rafael pleaded guilty pursuant to a plea agreement to Counts 1 and 2 of a Two-Count Superseding Information charging him with a conspiracy to fraudulently reduce taxpayer tax liabilities and thereafter electronically file those fraudulent tax returns with the IRS so that his customers could lower the amount of taxes they paid to the government and/or receive tax refunds that the customers were not otherwise entitled to.

Specifically, Count 1 charged Rafael with conspiracy in violation of 18 U.S.C. § 371, and Count 2 charged him with assisting in the filing of a false tax return in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2. Because this was a volume business, which prepared approximately 90,000 federal income tax returns for its customers just over the ten-year period framed in the Indictment, see PSR ¶ 9, the tax gain to individual customers was relatively small but the total tax loss to the IRS was substantial. Pursuant to the terms of the plea agreement the parties have stipulated to a tax loss of $145 million. Notably, not all the tax returns prepared by Rafael's company contained fraudulent information. Many were wholly legitimate. We acknowledge, however, that many also were not.

To be clear, that does not mean that Rafael profited $145 million through his tax scheme, it means that his customers did – split between thousands of low-income customers over an approximate 10-year period. Rafael's profit was significantly less and, after taking account of legitimate business expenses, the retained attorneys' fees received by his prior counsel who represented him pre-Indictment and in related civil proceedings, as well as a civil penalty Rafael paid to settle those civil proceedings, Rafael is now indigent, trying his best to build a new life. Again, we do not state the above to diminish the severity or wrongfulness of Rafael's conduct, only to give it context and put in perspective the end-result of his offense.

The Hon. J. Paul Oetken
May 15, 2025
Page 3 of 18

Rafael faces a statutory maximum sentence of five years on Count 1 and three years on Count 2, which can be run by this Court concurrently or consecutively. His effective – and stipulated – advisory Guideline sentence is 96-months imprisonment (i.e., 8 years). This high Guideline is driven by the loss tables contained in Section 2T4.1(M) of the United States Sentencing Guidelines; a calculation which, outside of reflecting that this is Rafael's first and only conviction, does not take into account the history and characteristics of this or any defendant.

Rafael's stipulated Guideline sentence of 96-months imprisonment is, of course, non-binding, advisory, and wholly subject to this Court's consideration of 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. 220 (2005). Moreover, ***there is no minimum sentence required by either count of conviction.***

The pages that follow will attempt to present this Court with a more-developed picture of who Rafael is as a person, not merely as a criminal defendant, in an effort to establish why Rafael deserves leniency notwithstanding his criminal conduct.

## III.    Who is Rafael Alvarez?

Rafael emigrated to New York City at age 17 in search of inspiration, opportunity and community. He is a proud Dominican-American, and the strength of this identity has inspired his professional and personal goals. His parents, Maria and Rafael Sr., instilled values of charity, hard work, and education, modeling themselves as hard working and community-minded citizens. Rafael, motivated and industrious, has volunteered for important causes and worked consistently since the age of 12. Even before graduating college, Rafael met his wife Gladys, developed a group of lifelong friends and colleagues, and started a successful business. Rafael dedicated many years to participation in city government, to growing institutions of public education, and to supporting the success and entrepreneurship of New York's Hispanic and Latinx communities. As will be discussed further below, the outpouring of support from friends and family for Rafael in preparation for his sentencing has been overwhelming.

His absence, as not only as a community leader, but as a financial breadwinner would create a substantial hardship for his wife, children, siblings, his mother and his work partners. Rafael has abided by the orders of this court during the pendency of this case and has taken responsibility for the instant offense. His legacy as a whole defines an individual dedicated to honor, integrity, and charity. In taking accountability, he has massively adjusted his lifestyle, most drastically by letting go of a business he has spent nearly 40 years building. Rafael has an indomitable spirit, leading an exemplary life as a leader of the Latinx community of Washington Heights, and as the patriarch of his family. He is steadfast in his faith in himself and in others, identifying new opportunities for growth while reckoning with the consequences of his crimes. We ask the court to consider Rafael's inspiring life history and the overwhelmingly positive contributions he has made to his community when determining a just and appropriate sentence in this case.

The Hon. J. Paul Oetken
May 15, 2025
Page 4 of 18

### A.  <u>Rafael's Early Childhood</u>

Rafael was born in Santo Domingo, Dominican Republic, on September 8, 1963. Rafael is the oldest of four siblings.  He has three sisters: Ana Ventura, Giselle de la Cruz, and Alina Alvarez.  His parents, Rafael Sr. and Maria, moved to the capital from the province of Puerto Plata, Dominican Republic, shortly before Rafael was born.

During summer breaks, Rafael and his siblings spent two weeks on their grandparent's farms in Gualete, and La Jaiba, Dominican Republic.  The bucolic setting and respite from busy city life helped foster a deep connection to the culture of their island.  Rafael and his sisters played in the river, feasted on mangos directly off the trees, harvested cassava and corn, and made chocolate from cacao pods with the guidance of their abuelas.  They all agree on this truth: their childhood was simple but contented, and at times, magical.



Rafael maintained a busy schedule in the capital. He attended Catholic school and additional English lessons and was an altar boy in their local church. He played baseball and basketball and participated in track and field. Maria hosted Rafael's sports teams at their home, often feeding them smoothies made with fresh fruit after practice.

Starting at age 12, during his lunch breaks, Rafael Sr. picked his son up from school and began teaching him to drive. At the same age, Rafael volunteered his summers to the Red Cross in the Dominican Chapter, stationed on a local beach as a lifeguard during the busy tourist season.



Rafael's parents purchased their home in Santo Domingo for 20 pesos, equal to roughly 20 US dollars at the time.  It had no roof, so Rafael Sr. installed one himself made of tin.  Rafael Sr. worked for 15 years as a satellite technician at the phone company CODETEL (now "Claro"), which not only provided a good salary and benefits, but also afforded the family a telephone. Maria brought rice and beans to community members in need, and their neighbors were allowed the rare luxury of using their telephone.  Rafael Sr. was a strict father.  Alina, when asked to describe him, shared "do you know the definition of dictatorship?  That was my father".  He expected his children to stay out of trouble by excelling in school, sports, and community engagement. His good example, guidance, and strong will made this a reality.

Rafael encouraged his sisters to take an active interest in their education, in work, and extracurricular activities. They remember his words of wisdom and encouragement such as: "girls, look around us, there are people in worse situations", and "do the right thing".  Before

category 5 storm Hurricane David hit in 1979, Ana, Giselle and Alina expressed fear that the tin roof would get blown off. 16-year-old Rafael responded by climbing onto a ladder and securing it with metal. The family waited out the storm at a neighbors' home while the hurricane ultimately displaced over 350,000 Dominicans. Luckly, their house remained intact, thanks in great part to Rafael's preparation. This is one instance of many across their lifetime that has solidified their trusting and unshakeable relationship with their brother. Rafael has always been their hero. In Giselle's words, her brother is "the greatest soul she has ever met".



Rafael graduated from Collegio Aposto Pablo in Santo Domingo in 1981 with his high school diploma. He worked as a waiter at La Manicera Club from age 15-17, eventually being promoted to financial administrator. He also worked as a tour guide at a resort 140 km east of Santo Domingo in order to strengthen his English skills. Rafael attended a concert at the club featuring Frank Sinatra and was overcome with emotion hearing him sing "New York, New York". His interest in developing language skills led him to buy a Cobra brand radio. From his room in Santo Domingo, Rafael connected with people all over the world, namely English speakers in New York City.

### B.    Rafael's Immigration to the United States and Higher Education

Rafael's father, Rafael Sr., obtained a work visa in 1970, and began his travels to the United States, eventually purchasing a home in Brooklyn, New York. Rafael arrived on April 15, 1983. As he entered the terminal at JFK, he was unexpectedly surprised with a welcome party of friends he made as a radio DJ. Rafael Sr. expected his son to begin earning immediately. He would not tolerate any lag in Rafael's productivity and growth, knowing all too well the challenges faced by new immigrants. A day after his arrival, Rafael's father set him up with his first job as a taxi driver. Rafael didn't know how to pick up customers, or how to navigate Manhattan. He took the opportunity in stride and with an open mind, and followed the words of his father, "tell them to show you the way". Rafael worked additional jobs for the construction company where his father worked, building police precincts and a school in Brooklyn. He also worked maintenance in one of the schools. Maria worked in a garment factory, hand gluing beads and sequins onto clothing. She commuted to New Jersey every single day, while also maintaining the home and cooking, with the help of her daughters.

Rafael was simultaneously struck by the possibilities of growth, and by the blessing of his opportunity to be in New York City. While he appreciated his stable employment, Rafael wanted more. He never wished to forsake the gift of the American Dream that his parents had offered to him. After his sisters arrived and his family relocated to Washington Heights to an

apartment at 500 West 135th Street, Rafael started exploring the possibility of higher education. His initial goal was to attend Columbia University, but tuition costs were prohibitive. Rafael Sr. drew a hard line for Rafael: "City College [i.e., CCNY], or no college". He enrolled in 1985.

Rafael held a work-study job in the computer center at the college, and in the admissions department at Mt. Sinai Medical Center in addition to his course work. On top of that, Rafael was elected and served as student body President. He met his wife Gladys in a swimming class offered by the school. Rafael became involved with "ASPIRA New York" – a non-profit, Puerto Rican-run company whose mission in part was to support Latinx and Hispanic students pursuing college degrees. They provided tutoring, counseling, computer access and materials to student members. Rafael worked as a peer counselor with ASPIRA, eventually becoming the president of this chapter and a representative for their programs nationwide, traveling to other states for the first time to participate in board meetings. His siblings participated in the club during their times at City College, and it introduced Rafael to his lifelong friends: Jose and Viviana Mantilla, Jose Hernandez and Griselle Aquino, Roberto and Belkis Lizardo, Fernando Penate and Ruth Cordero.



Their group, which they fondly refer to as "the village", shared values of hard work, charity and abstinence. Their community at large was suffering from the impact of the crack epidemic, but Rafael and his friends did not smoke, drink or do drugs. They were all second language learners who would need an extra year or more to graduate and pass a proficiency exam. They held jobs in addition to their schoolwork and relied on grants and other forms of aid to cover their tuition costs. They didn't have time to party. Most of the couples met through their participation in ASPIRA and have been married to this day. Rafael was the glue, motivating his friends in difficult periods, and setting an example they aspired to.

Rafael's grades suffered at the expense of his expansive work and activities schedule. He believed that the leadership skills cultivated through his jobs and volunteer work were far more meaningful than his college transcript. Rafael attributes his success in college to his friend group, his mother and sisters. With a short commute, home cooked meals and the ability to save money on rent, Rafael maintained a busy schedule. He drew on this well of love, support and inspiration when confronted with unrest and scandal at his college.

The Hon. J. Paul Oetken
May 15, 2025
Page 7 of 18

### C.    CCNY/CUNY Student-Movement

In 1989 Governor Mario Cuomo attempted to increase tuition and cut the budget of the City College of New York ("CCNY") and other schools within the City University of New York ("CUNY"), causing additional hardship for low-income students, layoffs and department closures. Rafael represented the student body in meetings with college administrators regarding the potential changes.    See Chittum, *Student rebellion: Price tag for CUNY growin' out of reach*, NY Daily News (article attached as "Exhibit B"). It was suggested to him that students take action to condemn budget cuts. Rafael helped build, and participated in, the first and second iterations of a student-lead movement across the 24 CUNY campuses. The student government he led met with



the Governor face to face, organized rallies in Albany, and took over a City College building on 57th Street. Gov. Cuomo was finally forced to veto the tuition increase that May, a clear victory for student organizers albeit a temporary one, as the Governor eventually approved a financial restructuring and layoffs of staff in 1992.

During his time in the CUNY senate as Vice Chair of Fiscal Affairs, Rafael discovered a small scandal that he helped make public. He noticed that student paid fees, meant to be allocated to the student government, were being mismanaged. When he brought his concerns to



the Vice Chancellor, the school ignored the allegations, as misappropriation was status quo at the time. Rafael got a call from a man running the student newspaper at SUNY Purchase regarding the rumors, and Rafael shared proof with the student reporter in support of their article. The story was eventually picked up by the Daily News, written by Juan Gonzalez, a Puerto Rican journalist who made a career of uncovering fraud and corruption. See Gonzalez, *400G spending spree by CUNY senate chief*, NY Daily News (article attached as "Exhibit C"). Rafael was "berated" in private for this by the Vice Chancellor. While embarrassing, he did not regret his choice to speak up against corruption.

### D.    Work, Political Engagement, and Community Organizing

At age 23, Rafael accompanied his father to a tax preparer. He noticed paperwork being done by hand and wondered why it was not computerized for efficiency. He learned that the IRS

was launching an e-file system and ultimately purchased tax preparation software in 1986. The software was available on a floppy disc, and Rafael used carbon paper to prepare his first returns for friends and family as he did not own a laser printer at the time.

When Rafael presented the idea of opening a tax preparation business to his parents, his father immediately rejected it. Having only $200 saved, he asked his parents for $20,000 as a startup fund. Rafael Sr. did not have the money but also found the dream of a business irresponsible. After his father's rejection, Maria handed Rafael $20. Rafael cried as he recounted her words, "I don't have $20,000, but I have this." Inspired by his mother's support, Rafael was also extremely hurt by his father's dismissal. Rafael Sr. very likely had a goal, as many Dominican people living in America, to eventually move back to the island. Therefore, it wasn't sensible to make a long-term investment in a business in the United States. Rafael Sr. encouraged his children to work hard, but for others. Rafael, who had obeyed his father until this point, saw an unmistakable need in his community for affordable and efficient tax preparation. He remained dedicated to his goal of building a business even without the funds or his father's support.

Maria's open-mindedness helped Rafael stay on track and gave him the idea to crowd-fund the money he needed. Rafael secured small loans from 30 friends to rent ATAX's first office space in 1987, located on Amsterdam Avenue between 135th and 136th streets. In addition to tax preparation, Rafael offered services that would be supportive to locals and students including a photocopy center, resume support, money transfers, beepers and phones, and travel agency services. Rafael ran ATAX while finishing college, graduating in 1989. He and Gladys were married in 1992. Their wedding was a major event, with nearly 400 family members and friends in attendance. Rafael moved out of his parents' home in the Heights and into an apartment in the Bronx with Gladys.

With the success of ATAX, Rafael thought of new ways to make tax preparation more accessible. In 1990, he started 1-800 Tax-Return. This phone-service connected customers to a network of tax preparers for which Rafael sold an annual subscription. Because the business from this service went to other tax preparers and accountants, Rafael ultimately lost most of the startup funds on his investment and was later evicted from the Amsterdam Avenue location of ATAX. In 1995, the twins – Kiani and Elani – were born, and Rafael now had a young and growing family to support. He felt ashamed and disappointed to have gone out on a limb with this business venture. Rafael Sr. was very critical of him during this time, using it as an example of why he was right to advise Rafael not to start a business. It was hard to stay motivated, and Rafael relied on Gladys, his faith, and his friends for the strength to move forward.

Rafael told his friend Victor Morisete-Romero about the loss of his storefront in 1996. Victor offered him words of encouragement, and reminders that he still had a good service to provide, as well as a loyal customer base. He offered Rafael the use of office space at 260 Audubon Avenue in Washington Heights. The space was utilized as a political campaign office by councilman Guillermo Linares, the first Dominican to be elected to New York City Council. Rafael could use the space for tax prep so long as he moved out by May. Revitalized by the

kindness of his friends, Rafael took up Victor's offer. Rafael worked out of this office space until eventually obtaining a bigger storefront on 179th Street and Audubon Avenue.

Due to his proximity to Victor and Councilman Linares, Rafael became involved in the Manhattan Democratic Club. The club was led by his childhood family friend, Luis Miranda, a successful political strategist and father of playwright Lin Manuel Miranda. Victor asked Rafael for help during the 1997 campaign season, collecting signatures of constituents in support of Linares' re-election. Rafael went block by block through the district, visiting every building and apartment therein, building a presence and deeper relationships with fellow community members.

In 1997, the second tax season at the new location, Rafael had over 3,000 clients. Simultaneously, Luis Miranda offered Rafael the opportunity to act as campaign manager for Isabel Evangelista, running for New York State Assembly, which Rafael accepted. He was also offered a job as campaign manager for Guillermo Linares. Rafael balked initially, his hands full with a young and growing family, and a busy tax business. He negotiated with Linares for a workday that ended at 4pm in order to do it all.

As Chief of Staff, Rafael communicated directly with constituents about their concerns, prepared press releases, and strategized legislative endeavors. This included the campaign to rename St. Nicholas Avenue to Juan Pablo Duarte Avenue, in remembrance of a founding father of the Dominican Republic. Rafael supported Hillary Clinton's reelection campaigns, hosting a welcome dinner for the senator at La Caridad Restaurant on Broadway and 184th Street. Linares chaired the Committee on Latino Education for former Secretary Clinton, connecting them to the White House and allowing Rafael the opportunity to meet former President Bill Clinton. Rafael once flew on Air Force 1 to attend the opening of an educational center in Texas.



Rafael raised funds and helped manage Linares' busy schedule of events at schools, senior centers, churches, parades, holiday gatherings, community boards and police precinct meetings. Beyond the higher-level political maneuverings, and Rafael's favorite part of the work, was the provision of direct, material support to constituents. Rafael donated his salary to any present need or cause including medical and funeral expenses, housing costs, and food.

The Hon. J. Paul Oetken
May 15, 2025
Page 10 of 18

In support of Victor, the friend who had done so much for him, Rafael gave back by volunteering his time on Victor's campaign for councilman for District 10 in 2001. Unfortunately, Victor lost the election after the campaign was disrupted by the events of September 11, 2001, see *AFTER THE ATTACKS: THE ELECTION; Primary Rescheduled for Sept. 25, With Runoff, if Necessary, Set for Oct. 11*, NY Times (Sept. 14, 2001) (available at https://www.nytimes.com/2001/09/14/us/after-attacks-election-primary-rescheduled-for-sept-25-with-runoff-if-necessary.html). Rafael stepped back from his chief of staff position after Victor's loss but remained responsible for his lease in Victor's campaign space. For a few years, Rafael leased the space to folks hosting events and parties to cover the cost of rent. The same year, Rafael, Gladys, the twins, and 1 year old Abigail moved from the Bronx to Cortlandt Manor, New York, where Rafael and Gladys still reside.

In 2004, Rafael received a call from Interboro College CEO and President John McGrath. He met with Rafael regarding the availability of the campaign space, admitting that they too were interested in hiring him to chair the location. According to John, "the community spoke very highly of him [Rafael]." At the time, Washington Heights had the highest number of high school dropouts in New York City. Interboro planned to open a campus there and offer a program for students to enroll and complete their GED while simultaneously working on their Associates Degree. Rafael's job included outreach to students who may have previously dropped out of school. Rafael negotiated a full-time position for himself at Interboro while also running his tax business. He could not say no to another opportunity to grow and strengthen his community.

Rafael drew on his personal experience as a student of color in New York City, now business owner, in his conversations with potential students. Rafael hired locally to market the program on cable and by word of mouth. His longtime friend and colleague Vladimira Acosta, who wanted to work for the location, could not do so without childcare. Rafael called around and found a daycare center with an open spot for her son. Many of the students at the new campus went on to pursue higher education, nursing, teaching and careers in law enforcement. Rafael and his family are still approached by those who remember him, thanking him for his support in getting them reinvested in their education.

### E.    Family

Rafael had to give up time with his young family to maintain his busy schedule. He and Gladys agreed before they had children that she would take care of all domestic responsibilities, while Rafael earned money and built his business. This traditional arrangement is a compromise that low income working families often have to make, but it allowed the duo to build a strong financial foundation while simultaneously raising well-adjusted and ambitious children.

Kiani and Elani called the business their father's "first child". Rafael was creative in spending every spare second with his girls. Elani, Kiani, and Abigail have all worked for or interned at ATAX, allowing them time with their dad during tax season, when they wouldn't see him as often. The twins attended trade shows with Rafael, including an event in London, their first experience abroad. Rafael always did school pick up and drop off, attended all school trips,

and planned camping excursions and vacations to visit family in DR, and to Florida to see friends or to visit Disney World. He surprised the girls with tickets to a Justin Bieber concert, waiting in line all night on the sidewalk to purchase them.

Rafael's daughters always felt like they could talk to him and Gladys without fear of retribution or punishment. They were always met with support and solutions. Moving to Westchester in 2005 was a culture shock for the twins, who experienced racism in a predominantly white setting. On their rides to school, Rafael offered them words of wisdom to understand that their sisters and family are their support system, and that they belong and matter, instilling them with self-confidence. The girls laughed and imitated their fathers' idioms, explaining to us that Rafael's encouragement has stayed with them into adulthood.

Rafael's goal was always to foster his children's independence. He has given full-throated support to all their personal and professional endeavors. Kiani, Elani, and Abigail are all now college graduates – the twins graduated SUNY Cortland and Abigail graduated the University of Rhode Island. The twins have studied abroad in Seville, Spain, and Abigail in Monaco, where she worked as an au pair and learned to speak French. Gabriela started her first year at the University of Pittsburgh in August 2024. Thanks to this Court's kind permission, Rafael and the entire family rode



with Gabriela to school to move her in and send her off with encouragement and support.

Rafael Sr. worked hard to prepare financially for retirement, but the transition was extremely difficult for him psychologically, in part because he was fired from his last construction job. Rafael Sr. drank heavily during his retirement, spending all day outside playing games, and coming home at dinnertime drunk. He uncharacteristically insulted Maria, which disturbed Rafael and his sisters. Rafael Sr. was walking back from the corner store in the summer of 2006, when he fell and hit his head. He was taken to the ER in an ambulance to St. Luke's Hospital but was not immediately evaluated for head trauma. The untreated bleeding in his brain caused him to have two strokes. This left him without the use of half of his body, impacted his speech and the ability to care for himself, and landed him in a wheelchair for the rest of his life.

Rafael Sr. spent 4 months in the ICU and ICU step-down at St. Lukes, then was transferred to a skilled nursing facility in the Bronx. Only a year later, he suffered another stroke and was intubated at St. John's Hospital to stabilize his airway. Rafael Sr. never regained consciousness. He died 3 to 4 weeks later on February 3, 2008. Rafael led the efforts in

planning his father's funeral with the support of Ana and Giselle.  He learned a lot watching his father's struggles at the end of his life, namely that our work should not define us, which has put his current transition to working less now into perspective.

Maria's community on 135th Street was very important to her, especially after her husband's passing.  Her routine and interactions with her neighbors kept her grounded.  When she began to show signs of dementia including confusion and memory loss in 2020, Rafael and his sisters fretted over removing her from her comfort zone.  They tried to support her at home, visiting frequently to ensure she was taking her medications.  By the time she accidentally lit a fire in her kitchen, Rafael and his sisters felt there was no other choice than to explore nursing home care.  She had a short stint in a facility, was then discharged, and lived with Rafael, Gladys, and Ana for a few months.  Eventually, she began to experience behavior changes and visual hallucinations, which worried her children further. They pushed for more testing and a psychological evaluation, which resulted in a diagnosis of bipolar disorder, characterized by short to long term highs (i.e., mania) and eventual depressive episodes.  A brain MRI also showed a tumor in her frontal lobe.

As much as they wanted to keep their mother's life stable and familiar, maintaining her independence became increasingly perilous.  Rafael again took up the role of the family patriarch in selecting a longer-term nursing facility the whole family felt comfortable with.  Maria has lived at Isabella Center in Washington Heights since 2022.  Ana visits often, and Rafael comes every Sunday afternoon, which is the thing Maria most looks forward to every week.  Although Maria is sometimes confused, she knows when to expect her son, and becomes fretful and agitated if he ever misses his visits, which is seldom.  Ana and Rafael both worry greatly about a potential absence, as this would impact their mother's stability and state of mind.  She will turn 90 years old this August.

Ana's health situation is also precarious.  She suffers from Lupus, an autoimmune disorder that causes inflammation in the body's joints, muscles and major organs.  Lupus flare-ups cause damage to the body's systems over time and can be brought on by stress.  She has been recently diagnosed by her dermatologist with scleroderma, which causes inflammation throughout the body's system, and thickening of skin and connective tissue.  Ana suffered a stroke during her pregnancy with her daughter in 2006, and a subsequent stroke in 2007. Rafael took care of his sister during this difficult time and allowed her to continue working at ATAX in order to maintain an income and health insurance, even though her ability to work was severely limited.  Ana returned to work as a dress designer at the outset of this case and has been doing her best to support her brother as his finances have drastically changed.

Rafael and Gladys' financial situation has become tenuous without Rafael's consistent salary. He has already paid $159,600 to the Government in relation to the settlement of his civil case, paid approximately $700,000 attorneys' fees to his prior retained counsel – still owes his prior counsel approximately $80,000 in unpaid attorneys' fees that he has no money left to pay – in addition to the $145 million restitution order and approximate $11.84 million forfeiture order, both of which will be imposed as part of Rafael's sentence in this case.

Rafael applied for a loan modification as he was not able to pay the mortgage on his house, and he is on a payment plan to cover utilities. Their home is currently in foreclosure, and he owes $750,000, with the inclusion of arrears on his initial loan. Ana has been helping where she can, but she also has a daughter to support and chronic health problems that incur ongoing doctor and hospital bills. She would do anything to help her brother, giving Rafael every leftover dollar she earns. Every Sunday after their visits with Maria, Ana urges Rafael and Gladys to accompany her to the grocery stores where she pays for their food. This is not a long-term solution for the family's finances, as Ana has her own expenses and a daughter to support.

Ana loses sleep over the idea of her brother going to prison. She frets over the day when they will need to explain to Maria where her eldest son is, and her likely inability to understand, which will cause the entire family immense distress. Giselle lives in Arizona with her two sons and her husband, working as a kindergarten teacher, and cannot be close by to support the family during this time. Alina has not seen her mother in a few years and is not equipped to support due to her own mental health struggles, leaving a fragile Ana in charge if Rafael is ultimately incarcerated. Ana fears that Rafael's absence alone will cause their mother's health to rapidly deteriorate, and that Rafael will not be present to hold the family together and make decisions should she die during his imprisonment. A recent review of research focused on family involvement within long-term care facilities found that visit frequency was associated with a reduction of behavioral and psychological symptoms for residents with moderate dementia. See Hayward, Gould, Palluotto, Kitson, Fisher, Spector, *Interventions promoting family involvement with care homes following placement of a relative with dementia: A systematic review*. Dementia, Vol. 21, Issue 2, at 618-647 (2021) (available at https://doi.org/10.1177/14713012211046595). Rafael's absence will impact the quality of Maria's care and deprive her of a stable and supportive figure at the end of her life.

## IV.    A downward variance is warranted in this case

### A.    U.S.S.G. § 2T4.1 is inordinately punitive

As previously discussed, the effective Guidelines range, which is also the Stipulated Guidelines Sentence under the terms of the Plea Agreement, is 96 months' imprisonment. See Pre-Sentence Report, dated, March 7, 2025, at ¶ 75; see also Plea Agreement, dated, December 9, 2024, at 4. These Guidelines are driven by the Tax Table found in U.S.S.G. § 2T4.1. Such a figure is higher than the estimated range for a defendant who had possessed (60 months) or even brandished (84 months) a firearm, see U.S.C. §§ 924(c)(1)(A)(i),(ii); see also U.S.S.G. § 2K2.4(b). Indeed, before adjusting for the statutory maximum under 18 U.S.C. § 371 (5 years) and 26 U.S.C. § 7206(2) (3 years), the recommended Guidelines range would have been even higher than had he discharged a firearm (120 months), see U.S.C. § 924(c)(1)(A)(iii); see also U.S.S.G. § 2K2.4(b). Thankfully, even Congress recognized that tax fraud should not carry a sentence as high as a firearms offense, or any number of other crimes.

### B.    The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

This is a unique case.  While the IRS suffered a substantial loss, the defendant was not the direct recipient of the lost funds.  Similarly, while Rafael's conduct was unquestionably wrong, his intent was not to cause harm but rather to help the underprivileged in his community.  Based upon the terms of the plea agreement, Rafael will be indebted to the Government for the rest of his life, responsible for approximately $11.84 million in forfeiture and $145 million in restitution – sums that will keep in debt and hopelessly impoverished for the rest of his life – on top of the $159,600 civil settlement that he already paid to the Government.

While imprisonment is often called upon to serve the role of providing "just punishment" in a criminal case, given the staggering financial penalties that Rafael will be subject to, those financial penalties alone serve a significant role in reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment for this defendant in this very unique case.

If the crime had been structured in such a way that Rafael reaped the primary benefit of the IRS's loss, or if Rafael's intent had been different than it was, then a term of imprisonment might be justifiable.  Here, however, we respectfully submit that the financial penalties alone provide a sufficient punishment in this case, and, to the extent this Court believes a sentence of imprisonment remains needed, then we respectfully submit that this Court impose as lenient a term of imprisonment as this Court believes sufficient, but not greater than necessary, to serve the purposes of punishment.

### C.    The need to afford adequate deterrence to criminal conduct

The financial penalties alone will make it virtually impossible for Rafael to ever regain solvency.  Having voluntarily accepted those penalties as part of his plea agreement, we respectfully submit that adequate deterrence has been afforded.

### D.    The need to protect the public from further crimes of the defendant

As the preceding pages have shown, Rafael is not a hardened criminal.  He is a good man who has always tried to do the best for his community.  He took that mission too far, without question, but he stands before the Court today humbled by the wrongful decisions that he made.  There should be no doubt in anyone's mind that Rafael will not reoffend and as such there should be no concern that the public – or the IRS – will be harmed by his conduct in the future.  Indeed, that has to an extent been ensured by the requirement, as a consequence of his conviction, to be barred from providing tax preparation services or tax advice forevermore.

Notably, despite his personal debt and the financial penalties that he will spend a lifetime paying down, Rafael remains motivated to provide for his family and community.  Since having to give up ownership and control of ATAX, he has started the Latino Franchising Association with the hopes of building a stable source of income for the future.  The organization aims to

support prospective owners in acquiring and running their own businesses. Additionally, he and his partners have identified successful existing businesses they might convert to a franchise. Consistent with his values and his life's work, this organization would promote job growth and the opportunity to build wealth within the Latinx community. He is one of, if not the only, Latino man in the national franchising space. While his new business venture is limited by the travel restrictions associated with his conditions of pretrial release, he has begun to earn some money with this new venture. In doing so he has shown his ability to slowly grow a new business while being fully compliant with his conditions of release – a true sign that there is no need to protect the public from his future endeavors.

### E.    The need to avoid unwarranted sentence disparities

Rafael has never been charged with or convicted of a crime outside of the instant offense. Importantly, he has also never spent any time in prison. A report published by the United States Sentencing Commission in 2023 found disparities in length of sentencing based on racial demographics. Specifically, of the cases examined in a 4-year period, Hispanic males received sentences 11.2% longer than White males. Hispanic males were also found to be 26.6% less likely to receive a probationary sentence. In addition to creating a substantial hardship for his family, a long sentence would exacerbate an already substantial racial disparity in the sentencing of white-collar criminals.

There also exists significant disparities in the way financial crimes are investigated and regulated. In 2017, the IRS investigated the tax returns of only 3% of millionaires in the United States. The same year, it was estimated that fraud by our country's largest corporations cost Americans up to $360 billion annually between 1996 and 2004. See *The Golden Age of White Collar Crime*, The Huffington Post (Feb 10, 2020) (available at https://www.huffpost.com/highline/article/white-collar-crime/).

Rafael has agreed to take financial responsibility for the offense, acknowledging his responsibility for the IRS tax loss even though the direct proceeds of his crimes was shared by his low-income clients whereas the proceeds he received – through collection of tax preparation fees – has long since been expended. As a first-time offender with zero history of any prior misconduct, a lifetime of good works to better his community, and an offense that benefitted the poor in his community much more than any financial gain that he received, Rafael presents a case far different than the Bernie Medoffs or Sam Bankman-Frieds of the world. Rafael's primary intent was to help others. While we cannot ignore the substantial loss suffered by the IRS, we also shouldn't ignore the primary intent behind his crimes.

### F.    The kinds of sentences available and the need to provide correctional treatment in the most effective manner

As this court is aware, the Federal Bureau of Prisons ("BOP") faces serious systemic issues within their facilities that endanger the health and welfare of the individuals in their custody. Issues of understaffing, crumbling infrastructure, and hundreds of preventable deaths have necessitated federal oversight including the Department of Justice. The Office of the

The Hon. J. Paul Oetken
May 15, 2025
Page 16 of 18

Inspector General has identified several operational and managerial deficiencies that contributed to the nearly 350 deaths of people in custody in the last ten years. During their most recent investigation in 2024, OIG found that prison staff often failed to respond to medical emergencies in an appropriate and timely manner. See Press Release, *DOJ OIG Releases Report on Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, Department of Justice, Office of the Inspector General (Feb. 15, 2024) (available at https://oig.justice.gov/sites/default/files/2024-02/02-15-2024_0.pdf).

Beyond that, staffing shortages have plagued multiple correctional institutions in the BOP system, impacting existing maintenance issues, access to inmate resources and safety overall. BOP estimated that the major repairs needed across its facilities would cost $3 billion. OIG determined that all 123 of the BOP's institutions required maintenance – finding, among other things, multiple facilities with seriously damaged and leaking roofs – and that conditions at three of its facilities had so substantially deteriorated that the BOP determined they had to be partially or fully closed. See DOJ OIG, *Challenge 1: The Ongoing Crisis Facing the Federal Corrections System* (2024) (available at https://oig.justice.gov/tmpc/challenge-1#shortages).

Rafael is 61 years old. This is the first and only time he has ever been convicted of a crime or even arrested. Any term of imprisonment will be devastating to him and, we respectfully submit, unnecessary. Indeed, the financial penalties alone present a sufficient punishment in this case. However, to the extent this Court believes that some term of imprisonment is needed, then we respectfully submit a sentence of no more than a year-and-a-day would be appropriate, as that would afford him the opportunity to serve his sentence in a Community Confinement Center where he can continue to build his new, entirely lawful, business. Such would likewise put him in a position to immediately begin repayment – real repayment – of restitution and forfeiture, rather than the small percentage that would be taken from his commissary were he imprisonment for a lengthier period of time.

Additionally, given his age, the longer a sentence he receives the less likely he will be able to repay even a fraction of the financial penalties imposed in this case. To the extent the Government actually wishes to see a return of its lost tax funds, a lengthy sentence would only serve to undermine that goal.

###### G.    During the pendency of this case, Rafael has proven his continuing value to his family, friends, and community.

Rafael has abided by all the orders of this Court, ceding control of ATAX to his twin daughters, who now fully own and control the business. He intends to give everything he can to make amends for his wrongdoing. He maintains exceptionally strong community ties and has had every reason to remain in Westchester where he has been close to his family. He is working tirelessly on his new business venture. His friends and family still rely on his emotional, physical, and limited financial support daily.

Rafael has given more to his community than he could ever take. He has touched the lives of countless people through his good work, inspiring them with his strength and ambition,

words of comfort, and material support. A long prison sentence will separate a father from his wife and children to whom he is deeply bonded with, aside from being their primary provider. It will deprive his sisters and his ailing mother from his calming and supportive presence, which they have grown to rely on over the span of 60 years. Rafael is a productive entrepreneur and responsible citizen who has built a sprawling network of friends, co-workers, and mentees. His continued presence and engagement within this community is desperately needed as the rights of legal immigrants to the United States are threatened. In consideration of Rafael's personal strengths, continued philanthropy, and strong community ties, we ask this Court to sentence Rafael to the most lenient sentence this Court believes to be sufficient, but not greater than necessary, to serve the purposes of sentencing.

Through all of this, Rafael has done everything he can to provide a positive influence on all those around him, and to turn his crimes into a lesson to impress upon his family and his community. His hope is that at sentencing Your Honor will see his past and continued good work as proof of who he is in his heart and in his being – a man who has committed crimes but who has contributed significantly more good in his lifetime than bad. The undersigned respectfully submits that his extraordinary lifetime of positive community achievements should be weighed heavily – and positively – in the consideration of his sentence, as should each of the letters submitted by his family and friends as an aid to this Court in a determination of Rafael's sentencing. See Exhibit A.

**V.    Conclusion**

This case presents a situation where the defendant has been convicted of serious crimes. The question, however, is how lengthy must the sentence be to be sufficient, but not greater than necessary, to satisfy the purpose of imposing the sentence in the first place?

Rafael Alvarez is a beloved father, husband, brother, and friend. He is a community leader that has fallen hard from grace but still inspires hope and shows on a daily basis his facility for redemption. Rafael takes full responsibility for his actions. Notwithstanding his criminal behavior, he has long made a positive impact on his friends, family, and community, and since his release on bond he has continued to do so. He has abided by every term of his release and attended all his court dates. He has shown a dedication to leading a better life; to being a doting father, supporting those he loves and those who love him, and continuing to find new ways to help his community. Rafael's progress in meeting these goals has been extraordinary but will be impeded if he is subjected to a long term of incarceration. We ask that the Court consider Rafael Alvarez's achievements, and renewed efforts to better himself and his community, in rendering a fair and lenient sentence.

We also ask that the Court not ignore the primary motivation behind his crimes – Rafael did not set out to make himself rich, he set out to help the low-income communities of Washington Heights and the Bronx survive.

At base, we respectfully submit that a sentence of no more than one-year-and-one-day imprisonment is appropriate for this defendant in this case. We believe such a term is

The Hon. J. Paul Oetken
May 15, 2025
Page 18 of 18

appropriate when one balances the severity of the offense with the mitigation discussed herein, which favors significant leniency. Given the mitigating circumstances outlined herein, we believe a downward variance is reasonable and we respectfully submit that it is fully supported by the parsimony clause of 18 U.S.C. § 3553(a).

As stated, the sentence imposed upon Rafael Alvarez must be one that is sufficient, but not greater than necessary to satisfy the purposes of sentencing. It is respectfully submitted that the mitigating circumstances outlined herein suggest that a sentence of no more than one-year-and-one-day imprisonment would be appropriate in this case. We ask that Your Honor impose such a sentence or whatever term of imprisonment this Court believes to be sufficiently lenient, reasonable, and appropriate for this defendant in this case.

As always, we thank Your Honor for your time and consideration.

Respectfully submitted,

Michael K. Bachrach
Richard H. Rosenberg
*Attorneys for Defendant Pedro Rivera*

Muriel Bell
*Mitigation Specialist for Defendant Pedro Rivera*

Attachments
cc:     All parties of record (by ECF)

# Exhibit A

February 27, 2025

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States vs. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge Oetken,

My name is Gladys Alvarez.  I am the eldest daughter of two siblings of hard working immigrant parents who came to the United States looking for the American Dream. I graduated from The City College of New York on June 14, 1991. Met my husband, Rafael Alvarez in college. We got married in November, 1992. Throughout the years, with God's grace and blessing, we became the proud parents of four beautiful, strong, and awesome young ladies ages 29, 29, 24, and 18. I have had the blessing and privilege of having raised them at home. It was not an easy task, as you can see by their ages that I had a set of twins right from the start. I (we) moved to Cortlandt Manor in 2001 to give our daughters (at that time 3) a better living experience than that of where we used to live at (the Bronx). We became part of our church community, The North American Martyrs (NAM) in Lake Peekskill (prior to that we were part of The Blessed Sacrament Church in the Bronx where our twins were baptized). Once a month we help our church community by providing a home cooked meal for the Jan Peek House Shelter. We also helped our NAM Family set up Friendship Sundays once a month giving that the weather is in our favor.

I met my husband Rafael Alvarez in a swimming class back in college. I have known him since 1985. Forty years to be exact. With time we became more acquainted through some classes we had together and from clubs we joined. Rafael has always been a very caring, kind, trustworthy, helpful, truthful, and mindful person. Always wanting to help those in need at school whether it was helping someone with any math problems or just being there for a friend in need, and never expecting anything in return. He's always been a giving person. When he started his first tax franchise business, if the client did not have the funds to purchase the franchise, he would tell them; "don't worry, you can pay me whenever you can or when your business starts to produce income." He would help them set up a store so they can get started with no money up front. Sometimes I would get upset at this because my husband has too good of a soul that he did not believe in his heart that some people do not have a mean streak. That's my husband for you.

One of the many things my husband has done without even thinking twice of it was when we became pregnant with our twins. When we found out we were pregnant, I was commuting back and forth to work from the Bronx to Mount Sinai Hospital in Manhattan. We were ready for one baby, but we were blessed with two. We started planning as soon as possible for when babies would come. One of the big worries I had was who would take care of them once I went back to work. I honestly did not want anyone else caring for our twins. My husband then said, "Baby don't worry, everything will be ok." He decided to take on two and sometimes even three jobs so that I could stay at home and take care of our newborns. He made it work! I will be eternally thankful to him for making it possible for me to be a stay-at-home mom back then, and throughout the rest of the years we had our other girls.

Respectfully,

Gladys Alvarez

September 11th, 2024

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States v. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge Oetken,

My name is Ana Ventura and I am a mother of my daughter, Anamil Ventura. I currently work at a private bridal company in Manhattan, New York as a bridal production associate. I don't participate in volunteer work or am involved with a church or congregation in my neighborhood but I occasionally make donations to my home country, Dominican Republic, to people who are in need of food and clothing suffering from poverty.

Rafael is my older brother and I have known him my whole life. One story I can share about Rafael is that throughout my pregnancy, I unfortunately experienced a stroke while I was 6 months pregnant and my brother helped me during that time and was my support system all throughout my health difficulties. In our community, I was able to witness my brother's compassion and humbleness to help others be successful by participating in local community events aimed to empower the youth and adults to motivate them into being better individuals.

One story I can share about Rafael's character and conduct is one time I was on my way to work on the subway and a young man from our neighborhood approached me, who happened to know who I am and who my brother was. He told me "Hello Ana, how are you? I just want to tell you that I am now a lawyer thanks to your brother helping me and I will never forget the promotional computer he announced in his business which I was able to obtain for school and helped me all throughout high school and college". This is a story I will never forget and always cherish in my heart because it shows how caring my brother was to others without even knowing them. He always felt the need to empower others to be successful and aim for a better future.

I ask you with all my heart that whichever decision you make regarding my brother to please take into consideration that we have our elderly mother in a nursing home who is diagnosed with dementia and has a pituitary brain tumor. She waits for her son at 4pm every Sunday to visit her. He brings her homemade coffee to enjoy with her throughout their visit. In addition, I myself am a three time stroke survivor and I feel an immense amount of pressure with this situation and worried about how my mother will take this situation about my brother. I suffer from certain health conditions and my brother helps me tremendously with my mother.

Thank you for reading my letter and I appreciate your time.

Respectfully,

Ana Ventura

January 19th, 2025

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square New York, NY 10007

Re: United States v. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge Oetken,

My name is Gisell De La Cruz, and I am Rafael's youngest sister. I am an elementary dual-language teacher, and I have been teaching for more than twenty years. I taught a diverse population of students first in New York, and now in Arizona, where I currently reside. I teach kindergarten students at a dual language school which I enjoy very much. I get to lay the foundation for their first learning experiences at school. I am also an after-school Lego League Club coach where I get to work with third through fifth grade students.

I am married and have two older adult sons in college. My younger son is studying software engineering, and my older son is studying business finance. I volunteer with my two sons packing food boxes for families experiencing food insecurity with FMSC (Feed My Starving Children) during my spare time. I enjoy doing volunteer work because this allows me to help make an impact in the world. I attend church with my family because faith and spirituality is something that has always been rooted in my life since I was a child.

Rafael has been very instrumental in my life. I remember when he used to bring his basketball team home, feeling proud of his teammates, and my mother would make them smoothies to celebrate their wins. He was very involved in school events and always encouraged me to work hard to achieve my dreams and goals. When hurricane "David" in 1979 came to Santo Domingo, Rafael climbed on top of the roof, effortlessly tying down and reinforcing the tin metal roof of our house. To me, he was like a hero, and I thought as a child that this was such a great act of bravery.

When I was a teenager, my sister Alina and I really liked the musical group "Menudo". We got news that they were performing at Radio City Music Hall in the early 1980's. My sister and I were not working and didn't have the money to go see them. Rafael surprised us with tickets and we were very happy. When we first moved to New York in 1983, Rafael was the first one who introduced my sister's and I to a "Big Mac" from McDonalds. We enjoyed every bite of this burger, as we came from very humble beginnings in the Dominican Republic. These memorable experiences stayed in my mind forever knowing that Rafael had shown such a selfless, and kind act as to use his own money to help us fulfill our teenage dreams.

One time, I came home when I was in high school and felt horrible because I had failed a test. Rafael encouraged me to keep going, stay positive, and not to give up. This was a tough time

for us since we were getting adjusted to a new culture, but Rafael would always cheer us up. Rafael is an amazing human being, not just because he is my brother, but because he always sees the best in people and in life.

Respectfully,

Gisell de la Cruz

September 11th, 2024

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States v. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge Oetken,

My name is Anamil Ventura and I am 27 years old. I was born and raised in Manhattan, New York. I work as a Practice Associate in a local hospital in Manhattan, New York. I currently work hybrid both between the office and at home. I occasionally participate in local community events. I completed my education in New York City and have a Bachelor's degree and a Masters degree in Health Administration and aim to expand my career in health care policy and health administration.

I am Rafael's niece and have known Rafael since I was born because he is my mother, Ana Ventura's, older brother. My uncle loves swimming, which in fact is a sport he dominated throughout college. If you know Rafael, you will see how much he truly enjoys spending time with his family, his daughters, dogs and his close friends and other relatives. He is devoted to his community and faithful to his Catholic church who he is a part of and attends to locals very often.

I would like to emphasize how family oriented, respectful and positive a person my uncle truly is. I have never met someone so well driven and determined like he is with his personal and professional life. The amount of balance he possesses in both aspects, professional and personal, are inspirational to me as a young woman. He has helped me by providing me my first job in ATAX when I was only 18 years old, which resulted in all my current knowledge and experience in customer service and administrative services. He is a very important person in my upbringing and responsible for my professional and personal growth as the young woman I am today. I don't say that just because he is my uncle, I say that because I know and truly believe it in my heart.

He has been supportive to me and my mother in so many ways that I wouldn't be able to describe it because it has so many occasions. A fun experience I have had with him recently is witnessing his passion for music and how much he loves having a good time in his home with all of his loved ones. It's great to see how much love he has for life in general.

Thank you for reading my letter and I appreciate your time.


Respectfully,
Anamil Ventura

3977 Sedgwick Ave #12g

Bronx, NY 10463

November 4, 2024

The Honorable J. Paul Oetken

United States District Court Judge

Southern District of New York

40 Foley Square

New York, NY 10007

Re: United States v. Rafael Alvarez,24 Cr. 221(JPO)

Dear Judge Oetken,

My name is Jorge Gautreau, and I am a retired New York City police sergeant. I am a member of the Dominican Officers Lodge, the Lions Club Impacto Chapter, and a lodge trustee. I work with the above organizations to foster goodwill toward law enforcement by giving back to the people. I am married and the father of four children.

I have known Rafael Alvarez for over thirty-five years and am proud to call him a friend. I first met Rafael when he came to speak at one of our meetings to educate and inform our members on the IRS tax code and to offer sound financial advice to our members. I was immediately impressed by his commitment to educating our community with sound financial advice. Additionally, he was always there to support our organization by generously donating to our scholarship fund because he understands the importance of a college education. Rafael is always there to lend a hand to the community when asked, and more often than not he volunteers his financial and educational support without being asked.

Throughout the years Rafael has demonstrated that he is a man of integrity. He is a devoted husband and a loving father to his two daughters. Rafael is a successful and dedicated businessman who never forgot his roots. He showed that he wanted to give back to the community through his charitable endeavors and his strong ties to our community. I feel privileged to call him a friend.

Respectfully

Jorge Gautreau

i

**Exhibit A at 6**

September 2nd, 2024

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States v. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge Oetken,

I, Robert E. Lizardo, am writing to you with deep conviction to express my unwavering support for Rafael Alvarez, a man who has not only become a cornerstone of our community but also a cherished friend who I consider family. Our connection spans over thirty years, beginning with our shared commitment to student government at the City University of New York (CUNY) in 1986. Together, we fought to ensure that higher education remained accessible, successfully persuading Governor Mario Cuomo to reject a proposed tuition hike.

Throughout my life, I have served my community in various capacities—as a member and president of Community School Board District Six, one of the largest school districts in New York and across the nation; as a Drug Counselor, NYS Housing Inspector, and Supervisor of Public Health Advisor for the NYC Department of Health; and as an Independent Realtor and Sales Trainer. I have also worked as a Community Director for the NYS Senate in Manhattan and as Bronx Office Director for the US Congress. My dedication to public service has always been fueled by a desire to uplift and empower those around me, and in Rafael, I have found a kindred spirit.

Rafael is a man of remarkable character. His virtues have illuminated my life and the lives of many others. Over the years, our friendship has evolved into a brotherhood, one rooted in mutual respect, unwavering support, and a shared belief in the power of kindness. Rafael's devotion to his family is unwavering, his generosity boundless, and his optimism contagious.

One memory that stands out vividly in my mind is a student protest outside the courthouse. Some of the students, driven by frustration, were on the brink of a confrontation with the police. In that tense moment, Rafael's empathy and moral courage shone through. He saw the potential for harm and, with remarkable calm and compassion, helped to deescalate the situation. This is who Rafael is—a man who instinctively protects and uplifts those around him.

Rafael's dedication to community service is truly extraordinary. He is always the first to offer help, the first to volunteer his time, and the first to advocate for causes that benefit others. His passion for improving the lives of those around him is not just evident—it is the driving force behind everything he does. The impact of his actions is felt deeply by all who have had the privilege of knowing him. In all my years of knowing Rafael, I have seen in him a rare blend of compassion, integrity, and an unyielding commitment to making the world a better place. He is a truly exceptional individual, and I am certain that he will continue to excel in any endeavor he pursues. It is with the utmost confidence and without reservation that I wholeheartedly endorse Rafael Alvarez. Please do not hesitate to contact me if you require any further information or insight into Rafael's character and qualifications.

Yours sincerely,

Robert E. Lizardo
15337 Montauk Lane
Clermont, FL 34714

**Exhibit A at 7**

## Letter to the Honorable J. Paul Oetken

September 18, 2024

To the Honorable J. Paul Oetken
Judge of the United States District Court
for the Southern District of New York
40 Foley Square New York, NY 10007

Re: Rafael Alvarez

Dear Honorable Judge Oetken:  I am pleased to write a letter of reference for Rafael Alvarez who I have known for the last thirty-five years when we were students at the City College of New York. We met at an English as a Second Language (ESL) class and since them we became friends. During our tenure as students at the City College of New York, Rafael and I were very involved in various causes to help other students to succeed and graduate from college.  I was elected Executive Vice President of the Student Government and later elected as the College Ombudsman. Rafael who had a deed social commitment to improve the lives of his fellow students was elected the President of the Student Government and later as a member of the City University Student Senate. As the President of the Student Government and Member of the City University Student Senate, Rafael led a fight to stop a tuition increases, improved security services at the college campuses, established a computer center for students at City College, introduced tutoring program for immigrant students and advocated for the establishment of the Latin American Literature Department at the College.

Although I graduated in 1990 from the City College of New York, Rafeal and I have remained friends.  In the thirty-five years I have known Rafael, he has evolved personally as a father raising his four daughters and professionally as a community activist and small business owner. Rafael has fought to improve the quality of lives for residents of upper Manhattan and was involved in various community development projects. He was a leading force in establishing the Interboro Institute Campus in Washington Heights, a co-founder of "Festival del Boulevard", a community event celebrating family, food, music, art, poetry, dance & more for the last twenty-five years.  He also has served as a board member of the Lead-Free Children Foundation and others community organizations. The Interboro Institute was an independent degree-granting college that helped hundreds of students obtain their associate degrees and pursuit other college degrees. Additionally, in 1990 Rafael collaborated with Upper Manhattan Community leaders to finance and sent four containers of food and medical supplies to the Dominican Republic when is was ravaged by hurricane Georges with 190 km/h winds, causing more than $1.2 billion and killing 589 people.  Also, Rafael founded the ATAX

*Letter for Rafael Alvarez for Judge J. Paul Oetken  -  pg. 1*

**Exhibit A at 8**

Franchise company, which has provided an opportunity to more than 25 small business owners to become financially independent and established dozens of jobs.

I have also, witnessed his dedication and commitment to raising his family and upholding good morals and family values. He and his wife Gradys worked very hard to raise four daughters, guided them to pursuit the education from elementary school to college graduation and instilled in them to be exemplary members of our society who consistently demonstrate positive behaviors, serving as role models for others by actively contributing to their community through acts of kindness, service, leadership, and ethical conduct, often going above and beyond expectations to make a positive impact on the lives of others. Rafael and his wife Gladys contribute financially to their church and their community as well.

He has a genuine good-natured personality and is always available to lend a hand when needed. I have never heard him speak ill of anyone and is generally pre-disposed to like everyone he meets. I have always observed Rafael to be very organized, hard-working and responsible. I have also seen him evolve professionally from a college student to a socially conscious business leader.

I respectfully ask you to consider when sentencing him, and that your sentence be merciful and not punitive, and that you consider all the people whose lives he has touched who will consequently miss him, and especially how his absence will affect the lives of his children

Thank you for your attention. If you require any additional information, please contact me at the number listed below or the email address herein.

Sincerely,

Victor Morisete-Romero
646-208-7047
vmorisete@gmail.com

Oct. 25, 2024

The Honorable J.Paul Oetken
United States District Court Judge
Southern District of New York 40
Foley Square New York, NY 1007

Re: United States v. Rafael Alvarez, 24 Cr.221 (JPO)

Dear Jedge Oetken,

My name is Vladimira Acosta, a mother, community advocate, political activist and psychologist. I am the mother of a young man which I raised with the help of my family and it is my pride and joy.   I arrived in the U.S. from the Dominican Republic in 1988 at age 14. My mother, a dressmaker who earned her living in the factories of the time, brought us to this country along with my father, a literature professor, and my two brothers.

Due to my father's constant participation in politics, I was always involved in community activities, politics, marches and everything that would represent a positive change for our community. My activism began at age 15. Doing activism was when I met Rafael Alvarez.

I met Rafael in the early 90s on the campus of City College, in NY.  At that time the Dominican community was making itself noticed on the university campus by participating in clubs, demanding better programs for the student body and making our culture and roots known.

Rafael was the president of the student government in 1994 when the protesting students took over the lobby and paralyzed classes. From that moment on, I began to testify to his ability to negotiate, his leadership prevented the main reason for the takeover from getting out of control and at the same time getting our claims addressed at that moment with the local authorities. From there I began to participate in the activities I carried out to raise funds at the university.   Rafael always showed an entrepreneurial spirit and was very altruistic with newcomers who did not know the system.

In June 2006 I was unemployed and a friend got me a job at a preparatory school that would open a branch in WH, to my surprise Rafael was the Administrative Director of the institute. I was a single mother and in order to take the job I needed a camp for my son. Without that help I couldn't take the job. I went to Rafael and he made some calls and found me a space in a community center. From that moment on, we no longer lost sight of each other, a friendship was formed that remains to this day.

At that time the Dominican community was in rapid development, on a political and social level. There was a high dropout rate among our young people and the goal of Rafael and the team was for the young people of WH to be interested in acquiring an associate.

During the years we worked together I witnessed his commitment and dedication to the causes of the WH community.  It was a support for students who could not buy their books and complete their tuition to achieve a university degree, all of this at their own expense, without expecting something in return. He was a standard bearer for all social classes that could bring prosperity and decency to our community.  At the same time he developed his tax business, at that time technology had not boomed and everything was manual, he always showed his passion and hope for what he was building.

Something that I always admired about Rafael is his optimism. On one occasion we arrived at work together and he was listening to Tony Robbins. I asked him "how are you?". He answered me, "today, my car broke down, we have to look for the girls' milk, but I am certain that

**Exhibit A at 10**

everything will be solved by the end of the day." I replied, "where can I buy that cassette?". From that day on my son and I listened to Tony Robbins.

When Rafael opened his new facilities at 225 St., I stopped by to greet him, happy but never surprised by his triumph since he was a tireless worker. His progress was motivating, his passion was contagious, in fact many people including me admired Rafael's talent and dedication.

I lived for a while between the Dominican Republic and the U.S., every time I returned to NY I would stop by to say hello, I liked their passion more and more, we spent hours talking about our goals, how important it would be for us Latinos to make ourselves noticed in the market, with a brand that was not as mechanical as the existing ones. He had already conceived his franchise idea and proposed opening one. I declined because it was not my area and I did not live 100% in NY. On occasions I worked part-time with him, there he continued to testify about the contributions to the community and the number of people from all backgrounds who were going to request his help: for charity dinners, to pay the rent, to complete tuition, for a prescription medicine, for relatives in the DR, or for an activity. He always looked for a way to help totally or partially. He was still the same altruistic person I met at City College.

Personally, I thank him for his mentoring, he always had a book to recommend, an audio to listen to that promoted personal growth. I always saw him as an example of improvement, a fair and empathetic human being, who did not show attachment to material things. He dressed decently but not expensively, he did not brag about his economic progress but he did show pride in everything he had achieved, but he was not a braggart and despite his successes he never lost his essence as a noble human being, nor his affordability. The times I worked with him I never saw him humiliate anyone, speak rudely to them or correct them sharply. Rafael is a tireless worker, a great provider for his family, it is evident in the great family and professional education of his daughters, who always saw him as a tireless worker and to whom he always told "education opens doors." Today they are all professionals.

No matter how much work he had, he always made time to go visit his mother. He always said: "My father told me on his deathbed, take care of your mother and your sisters." He has done it.

I thank him for the way he was a mentor to my son, serving as a father figure at times and inspiring him to go to college. Today my son is in the tax field and knows that he learned from a great professional.

Rafael is one of those human beings who are a reference for generations that you can come from less favored backgrounds and can achieve success, an example that with education, values and hard work you can beat the statistics. Rafael confirms in our community that the American dream can be achieved, because it has been 30 years of constant work of ups and downs of facing challenges but having the strength to start again, of missing some important dates, of not being able to say good night to his daughters, to compete in the highest spheres and still keep one's feet on the ground, to shine with one's own light on a path with many stretches of darkness. Rafael Álvarez is simply an example of resilience.


Respefully,

Vladimira Acosta

Tuesday, November 19, 2024

The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE: United States v. Rafael Alvarez, 24 Cr. 224 (JPO)**

Dear Judge Oetken,

My name is Fernando A. Peñate I am non-licensed Architect currenting working as Zoning and Code Consultant for a Midtown Expediting Firm. I am a parent of two kids and have been married to my wife Ruth Cordero for over 36 years and have lived in the Bronx ever since. My wife and I are still working and live in our own home with our two adult children in The Bronx. We are very involved in our community and in our Roman Catholic Church of Blessed Sacrament and are members of the Parish Council of the merged three churches (John Vianney-Blessed Sacrament -Holy Family). We are active participants in our church group "Our Lady Virgen of the Divine Providence" of Blessed Sacrament. We are also involved in a Community Base Not-for-profit organization named Castle Hill Neighborhood Betterment Association. With this organization we fought against a developer not to build the so called "Hot Sheet Motel" and the entire community of Castle Hill got involved with our fight. Ever since our children started parochial school, we both have been very participant in their school years, from kindergarten to high school, getting involved in all kinds of school activities such as fund raising and helping the schools. It can be said that this is a trait that we learned during our college years.

My wife and I met at City College of the City of New York in the Spring of 1982. I was an Architectural student, and my wife was studying Sociology. In 1983 there about, my wife met Rafael Alvarez, because she belonged to the Aspira Hispanic Club of New York at City College. I was a member but not as active as was my wife, due to my career scheduling of classes. Mr. Alvarez joined the Aspira Hispanic Club circa September of 1983 where he met my future wife, Ruth. My wife then introduced me to Rafael Alvarez, and we immediately hit it off and became good acquaintances and friends. Mr. Alvarez became the Vice-President of the Club, and my wife was the President at that time. The Aspira Hispanic Club was created with the intent to assist the new Hispanic college student with their difficulties that they face during their college years. Mr. Alvarez then was awarded the Presidency of the Club and that is where the club grew its membership. The club was composed of about thirty plus students from different Latin-American countries. Mr. Alvarez was always a visionary and always wanted to help everyone without expecting anything in return. That was his natural trait. The club members enumerated a list of necessity items that would benefit the students during the years they would be studying at City College. Mr. Alvarez as the president started working the necessity list that the club organized and started with a Fund Raising event at the College Campus to raise money so the Club can have their own computers, diskettes, pen and pencils, and notebooks, so student can do their assignment for those student that did not have the funds to acquire a computer or any of the materials needed. The fund-raising event was very successful that as a result two computers were bought and installed at the club room and now students can come to the club during their off hours and prepare papers or any other assignments they needed to prepare for their career.

**Exhibit A at 12**

Mr. Alvarez ideas became bigger that he envisioned to host a Party with real Hispanic Orchestras and the first was with "Milly Jocelyn y los Vecinos Band", a dominican merengue genre. All members of the club actively participated in this event, which was also very successful. The club, with the leadership of Mr. Alvarez at the helm, continued to host fundraising parties, sometimes twice a year for the next two to three years. All the funds collected were invested back at the Aspira Hispanic Club for the benefit of the college students. His visionary ideas were so excellent that other clubs at the College became interested in joining forces to help them out as well. The Aspira Hispanic Club of City College became known outside the campus thanks to the leadership of Mr. Alvarez.

Throughout the college years of many club members, friendship became so close knitted that couples started dating and developing relationships and thereafter the first three marriages of members ensued. I for one married Ruth Cordero and Rafael with his girlfriend Gladys Rivera along with other four more couples became part of our wedding party back in July 1988. In September 1988, Mr. Alvarez organized a bus trip to Toronto, Canada so we get to know our neighbors to the north and learn about their culture and my wife and I were invited to join them on this bus tour since we had already graduated. This is another trait that Mr. Alvarez possesses, to maintain relationships. Such relationships were so close that it can be said that it became an extended family for all of us. Ruth and I decided to invite the members of the Aspira Hispanic Club to take a trip together to Cancun, Mexico in the summer of 1989. Four years later, Mr. Rafael Alvarez and Gladys Rivera tied the knot and got married. Mr. Alvarez selected Ruth and I to be the "Godparents" of their wedding,

During his tenure years at City College Rafael Álvarez was the recipient of many merits and awards due to his leadership and hard work as a student advocate. He received the Aspira of New York Year award from then New York Governor Mario Cuomo for his contribution to the student government at City College. Mr. Alvarez always demonstrated his business administration traits by inspiring other students to participate in internships to expand and create collaborations through non-profit experiences. Aspira of New York, INC was one of the organizations that brough the group together, but Mr. Alvarez provided the group with leadership and a vision of a better future through education and giving back to the community.

Mr. Alvarez loves friendship, and above all loves his family. My wife and I became the godparents of their first-born twin girls that my wife was there when Gladys needed help during her pregnancy. We helped Mr. Alvarez and Gladys Alvarez find an apartment that they moved to in the Bronx, only four blocks away from our then residence, so we could be close to them and help each other.

Mr. Alvarez has always been a hard-working individual and working for someone else was not going to be his life, he needed to aspire for more that he decided to open a copy center across from The City College so students can have copies of their assignments. He then invested in Beeper services, since those were the norm of that time, his business started growing and he needed to expand. Due to his successful copy center and Beeper business Mr. Alvarez donated funds to St. Anthony School in the Bronx during a Carnival event that the school was hosting for children's activities.

Mr. Alvarez has a lovely heart and is a very pleasing and respected individual by all and all members of the community. Throughout the years we have always admired Mr. Alvarez our "Compadre" for been such a wonderful, caring, husband and father to his children and all the people that are close to him.

Wonderful human being!

Sincerely,

Fernando A. Peñate

January 4, 2025

The Honorable J. Paul Oetken
United States District Court Judge Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States v. Rafael Alvarez, 24 Cr. 221 (JPO)

Dear Judge, Oetken, my name is Isioma Ogbue, I am self-employed, and I live in Westchester County, NY with my husband and my two children: an 18-year-old boy and a 14-year-old girl.

My family met Rafael & his family at our local church, St. Columbanus Church of the North American Martyr over 19 years ago. Our families became friends shortly after. Rafael and his family are one of our dearest friends. Our children grew up together and often spend time with one another.

Rafael is very kind and is always there when you need a friend. When we had our first child and the godfather could not come for the baptism, Rafael gladly stepped up to represent our family and stood in has the godfather. Till today, our son knows Rafael has his godfather. Both our children call him Tio (uncle) because that is what he has always been to them.

Rafael and I love to sing, and we sometimes perform duets at family gatherings. He also conducts the choir at our church where we both volunteer. Rafael makes us laugh, I remember when the Gangnam style song first came out, Rafael proceeded to perform the dance surprising us all with very good moves.

Rafael is a wonderful support for all around him. He is devoted to his family and his friends find they can be at home with him.

Respectfully,

*Isioma Ogbue*

Isioma Ogbue

# Exhibit B

# Student rebellion

## Price tag for CUNY growin' out of reach

By SAMME CHITUM
Daily News Staff Writer

Rafael Alvarez, a hardworking immigrant, seems an unlikely rebel.

But Alvarez, president of the Day Student Government at City College, says he is committed to protest a proposed tuition hike and state budget cuts that have convulsed the City University.

Behind his commitment, he says, is the belief that education is priceless and the first step out of the world of the working poor.

"My sister, she has just been accepted to start City College as a freshman," said Alvarez, a 26-year-old computer science major. "If this tuition increase goes through, do you know what it means to her? I don't see how she's going to make it."

But for the Cuomo administration, the difficult ques-



DAN FARRELL DAILY NEWS

tion of how much education should cost and who should bear the burden is tied up in the broader struggle to close a $6.5 billion budget gap, cope with a severe economic downturn and balance political realities.

### State's budget gap

To close the gap, the administration has proposed more than $4.5 billion in spending cuts, a 19-cent-a-gallon hike in the state's gasoline tax and other "revenue enhancements."

Cuomo has resisted an increase in the state income tax, saying it would hurt an already reeling economy.

"Education is a huge part of the budget," said Cuomo spokesman Tom Conroy, "There is no way we could spare education."

Conroy called CUNY, the largest urban university in the nation with 21 campuses and nearly 200,000 students, "a tremendous bargain. If it's not the bargain they want it to be, there's no better deal across the street."

The governor has proposed raising CUNY tuition by $500 a year to produce $40 million of the $92 million he wants to cut from the budget and student aid. The rest would come from faculty and staff layoffs and program reductions.

The proposals, which must be approved by the state Legislature, are part of a pattern of economic-driven changes in CUNY.

The university was free from its founding in 1847 until 1976, when a $925 fee was imposed. That has been raised four times to $1,450.

### Ethnic student body

Alvarez, who works two part-time jobs, is part of CUNY's traditional immigrant constituency. The university's enrollment, 37% white, 31.9% black, 22.5% Hispanic and 8.6% Asian, reflects the city's changing racial and ethnic mix.

He is among dozens of students — hundreds

### AT A GLANCE

## CUNY SYSTEM

■ **SIZE:** CUNY is the third-largest university system in the country after the California State schools and SUNY. It's the largest urban university in the nation with 21 campuses in five boroughs. Its schools include one graduate school; 13 senior colleges (including law and med schools), and seven community colleges.

■ **ENROLLMENT:** 194,000 students, including 159,000 undergraduates.

■ **STUDENTS:** 60% women. Half of all students are from families with annual incomes of less than $22,000, and 20% of the total are parents. Half the students are under 25 years old, and 42% attend part time.

■ **DEMOGRAPHICS:** 37% white; 31.5% black; 22.5% Hispanic; 8.6% Asian.

■ **TUITION:** $1,450 a year. Compares with Cal State annual tuition of $780, which is going up to $936 next year. Cal State has $309,000 students in 20 four-year colleges.

■ **HISTORY:** CUNY founded in 1847 through a city referendum, was called the Free Academy. Campus now the site of CCNY in Harlem. Began charging tuition for first time in 1976, when four-year college cost $925 a year. In free-tuition era, CUNY graduated 11 who would later go on to win Nobel Prizes.

throughout the CUNY system — who have occupied campus buildings and forced cancellation of many classes.

In dozens of interviews, these students said they viewed the proposed tuition hike and budget cuts as a barrier to future careers that would insure a firm footing in the middle class.

"This will have a generational effect on minorities," said Brenda Brinson, 25, a divorced mother of two and a full-time Lehman College student. "Who do you think these cuts are hurting? They're hurting the people who have not. They're trying to shove us back down the rathole."

The CUNY administration, lead by Chancellor W. Ann Reynolds, has sympathized with the students —



BRIAN BRAINERD

### TUITION HIKES

Annual full-time tuition for four-year colleges in City University system.

| ■ 1847-1976 | Free |
| --- | --- |
| ■ 1976 | $925 |
| ■ 1982 | $1,075 |
| ■ 1983 | $1,225 |
| ■ 1984 | $1,250 |
| ■ 1991 (spring) | $1,450 |
| ■ 1991- (fall)* | $1,950 |

*Proposed

to a point. On Friday, Reynolds and CUNY Board of Trustees Chairman Joseph Murphy urged campus presidents to enforce disciplinary procedures against disruptive students.

CUNY spokesman Jay Hershenson said, "The ma-

jor difficulty with this budget is that while tuition is being raised, the financial aid safety net is being shredded."

In the legislative wrangle over the state budget, Assembly Speaker Mel Miller (D-Brooklyn) has suggested phased-in tuition hikes over three years.

"But if you have to raise tuition, and I think you do, then you can't cut student aid at the same time," Miller said.

Republicans, who control the state Senate, apparently have not been moved by the week of student demonstrations.

"It's a bad year," said John McArdle, spokesman for Senate Majority Leader Ralph Marino (R-Nassau). "There are cuts all around. They [students] are not being singled out."

### SIEGE
City College student leader Rafael Alvarez says education is priceless and the first step out of the world of the working poor (●); Dawn Diorio (◆) behind the counter at Goody's Bagels & Deli on Staten Island, where she's employed at one of the three jobs she works to pay for school; and York Colleges sophomores Theresa Gibbs and Reginald Lide (●) post signs yesterday protesting the proposed tuition hike.



WE'RE FIRED UP. WE CAN'T TAKE NO MORE!

STOP ($500) TUITION

PAUL DEMARIA DAILY NEWS

# Exhibit C

# 400G spending spree by CUNY senate chief

**C**ALL it Government Spending 101.

This city's biggest spend-thrift politicians could use some lessons from Brooklyn College student Jean LaMarre.

LaMarre is chairman of the City University of New York's student senate. In that post, he represents 200,000 mostly poor and working-class students who are struggling to stay in college despite escalating tuition costs.

But during the past year, while protests and strikes against tuition hikes rocked the university, LaMarre authorized spending more than $400,000 of student senate money on, among other things, huge hotel bills, limousines, trips to Africa for close associates and even a job for his sister.

Among the extraordinary expenses charged to the student senate, composed of representatives of CUNY's student governments:

■ $13,000 for limousines to transport LaMarre and a handful of other student officers around town;

■ $49,000 for a three-day student legislative lobbying conference in Albany in February. Of that, $24,000 alone was spent on room service by LaMarre and some of the 75 students who attended;

■ $7,700 to rent walkie-talkies for a one-day rally at Baruch College;

■ $2,200 for electronic pagers;

■ $24,000 for the full-time salary of LaMarre's twin sister, Elizabeth, whom he hired as his personal assistant;

■ $28,000 for a weekend student conference at Lake Placid.

The unusual expenses were revealed yesterday in an article by the Student Leader News Service in New Paltz and confirmed by the student senate vice chair for fiscal affairs, Rafael Alvarez.

LaMarre and his officers began the spending spree on the very first day of the senate's fiscal year, Jan. 1. That day, he authorized $182,000 in spending, mostly for salaries of the senate's small staff — including his sister — and stipends for himself and his fellow officers. LaMarre, a speech major, gets a $650 monthly stipend as chairman.

By the end of February, two months into the fiscal year, LaMarre had spent two-thirds of the senate's $345,000 budget. Then, when $79,000 left over from a previous administration was found, the student senate officers just kept spending.

But what was treasurer Alvarez, the former student government president at City College, doing while all this money was flowing out?

"Most of the time I wasn't even notified," Alvarez said yesterday. "I'm a member of the nine-member steering committee, but that doesn't mean I



**BROOKLYN COLLEGE** student senate chairman Jean LaMarre testifies in Albany.   SUSAN WATTS

agree or approve of how the money was spent. Our committee hasn't even met since April."

According to Alvarez, it was not until last week that he got a printout of



**JUAN GONZALEZ**

expenditures from university officials, and he immediately released the report to the Student Leader News Service.

Of the three-day Albany conference, Alvarez said he opposed it when he was told how much it would cost.

"Why did we have to stay at the Hilton and not a cheaper hotel in Albany?" he asked. "Why didn't we try to get different bids or better prices? It was a terrible waste of money."

Here were student leaders up in Albany to convince legislators faced with a $2 billion deficit to keep tuition costs down. And how do the students act? Like stockbrokers before the crash.

LaMarre, who has a reputation as a silver-tongued public speaker, wasn't talking yesterday. He did not return repeated telephone calls to his house or the student senate office.

But like any budding politician, LaMarre has a paid spokesman. That spokesman, Steve Kleinberg, said LaMarre would not be available for comment.

"I just need more time to review the matter," Kleinberg said. He promised a response by sometime today.

As for the university, its spokesman, Jay Hershenson, said the duly-elected

> **'Why did we have to stay at the Hilton and not a cheaper hotel in Albany?'**
> — *Rafael Alvarez*



**FISCAL WATCHDOG:** City College student Rafael Alvarez.   ANTHONY PESCATORE DAILY NEWS

student senate is free to spend money as it sees fit as long as no city, state or federal laws are violated.

That, said Hershenson, is how students learn responsibility.

"The students themselves have to debate these issues," he said.

The senate's budget is financed, at 85 cents per student per semester, from student activity fees.

But a senior university official familiar with LaMarre's and his offi-

cers' spending habits called them "appalling, considering how students in CUNY are suffering economically."

"It doesn't take a rocket scientist to figure out spending that kind of money on a car service doesn't do anybody any good, including the person who took the ride," said the official, who asked not to be identified.

"Well, young LaMarre may not catch on with NASA, but from here, he sure looks like City Council material."

**Exhibit C**