**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**– v. –**

**RAFAEL ALVAREZ,**
    **a/k/a "the Magician,"**

                **Defendant.**

**S1 24 Cr. 221 (JPO)**

**THE GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT RAFAEL ALVAREZ**

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

David R. Felton
Assistant United States Attorney
        *- Of Counsel -*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

– v. –

**RAFAEL ALVAREZ,**
    **a/k/a "the Magician,"**

            **Defendant.**

**S1 24 Cr. 221 (JPO)**

---

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT RAFAEL ALVAREZ

The Government respectfully submits this memorandum in advance of the sentencing of defendant Rafael Alvarez, currently scheduled for Thursday, May 29, 2025, at 11:00 a.m.  As set forth in the Presentence Investigation Report ("PSR") and in the parties' plea agreement, the defendant's applicable sentencing range would otherwise be 168 to 210 months' imprisonment but, pursuant to U.S.S.G. § 5G1.1(a), because the statutory maximum sentence is 96 months, the Guidelines sentence is 96 months (the "Stipulated Guidelines Sentence").  For the reasons explained below, the Government submits that Alvarez's role as the architect of a long-running, tax fraud scheme that resulted in an actual tax loss to the U.S. Treasury of $145 million is serious criminal conduct warranting the Stipulated Guidelines Sentence of 96 months and that a lower sentence would fail to serve the essential sentencing goals of affording general deterrence and promoting respect for the law.  To the extent that the Court is inclined to impose a downward variance sentence, the Government submits that a significant incarceratory sentence along the lines of the 84 months recommended by the U.S. Probation Office would be appropriate.

# I.    BACKGROUND

## A.  Offense Conduct

### Tax Fraud Scheme

From 2010 through 2020, Alvarez was the Chief Executive Officer of ATAX New York, LLC, also doing business as ATAX New York-Marble Hill, ATAX Marble Hill, ATAX Marble Hill NY, and ATAX Corporation (together, "ATAX").  ATAX was a high-volume tax preparation company located in the Bronx, New York, which prepared approximately 90,000 federal income tax returns for its customers, and Alvarez was the owner and manager of ATAX.  Alvarez has been preparing tax returns since 1990.  Alvarez prepared tax returns for ATAX customers and recruited, supervised, and directed other ATAX personnel who in turn prepared tax returns for customers. (PSR ¶ 9).  Among other accolades previously touted on its website: in 2014, ATAX was recognized as one of the Top 50 Low Cost Franchises in the nation by Franchise Business Review; in 2020 and 2021, ATAX was named to Entrepreneur Magazine's list of top 500 franchises; and also in 2020 and 2021, ATAX was named to the top 200 franchises by Franchise Business.

From 2010 through 2020, Alvarez oversaw an extensive fraudulent scheme, whereby Alvarez and his employees submitted false information to the Internal Revenue Service ("IRS") in tens of thousands of ATAX customers' tax returns.  This false information, which included fake itemized tax deductions, made-up capital losses, illegitimate business expenses, and fraudulent tax credits, served to fraudulently reduce the customers' tax liability and increase the customers' tax refunds from the IRS.  In total, the scheme deprived the IRS of $145 million in tax revenue.  (PSR ¶ 10).

Customers interested in filing their tax returns at ATAX would meet with ATAX personnel in the Bronx, and would provide ATAX employees with supporting documents in order to complete their tax returns.  During the process, many customers met directly with Alvarez.  In numerous instances, Alvarez falsified these customers' tax returns in order to greatly reduce the customers' tax liability.  Many of the numbers that Alvarez entered were completely fictitious and were not supported by any evidence or documentation.  (PSR ¶ 11).

Alvarez created this reduced tax liability for ATAX customers through fraudulent: Schedule A tax deductions-itemized tax deductions involving medical expenses, charitable contributions, and job-related expenses; Schedule C business expenses; Schedule D capital gains and losses; Schedule E expenses-income from rental real properties and S Corporations (pass-through entities); Form 3903 moving expenses; Form 8917 higher education tuition and fees; head of household filing status; and residential energy credits.  Examples include: (a) fraudulent Schedule Es for customers that never maintained a rental property; (b) fraudulently overstating and/or making up expenses for repairs, supplies, cleaning and maintenance, and utilities, and understating income on the Schedule Es; (c) fraudulently overstating and making up Schedule D capital losses; (d) including fraudulent claims for residential energy credits by fraudulently inventing qualifying expenses for, among other costs, solar electric, solar water, and geothermal heat pump property costs; (e) fraudulently overstating and making up moving expenses, including expenses for transportation and storage of household goods and personal effects; (f) fraudulently overstating and inventing tuition expenses; and (g) fraudulently electing the head of household filing status for married and single customers, and fraudulently including non-qualifying

individuals as qualifying relatives. (PSR ¶ 12). The largest drivers of Alvarez's fraudulent tax loss come from fraudulent Schedules C and E.

The practice of Alvarez falsifying ATAX customers' tax returns was so prevalent that he came to be known among ATAX customers as "the Magician" due to his ability to make deductions, expenses, gains, and losses appear and/or disappear in order to reduce the customers' tax liability. Indeed, Alvarez and ATAX attracted clients from far and wide because Alvarez was willing to simply make deductions, expenses, and gains and losses appear essentially out of thin air, earning him the moniker "The Magician" among his clients.

Below are four examples of how Alvarez falsified customers' tax returns:

| Taxpayer | Tax Year | Filing Date | Fabricated Items | Criminal Tax Deficiency |
|---|---|---|---|---|
| W.G. | 2019 | July 12, 2020 | Head of Household; Schedules C and E | $7,935 |
| M.L. | 2019 | March 17, 2020 | Schedules C and E | $10,607 |
| P.L. | 2019 | February 17, 2020 | Head of Household; Schedule E; Residential Energy Expenses | $10,607 |
| J.C. | 2017 | February 3, 2018 | Schedules D and E | $3,521 |

(PSR ¶ 13). Among the various former ATAX clients interviewed whose tax returns were reviewed: 79 out of 94 applicable returns fraudulently claimed the head of household filing status, 26 out of 29 applicable returns made up fraudulent Schedule D Capital Losses, and 17 out of 19 applicable returns fraudulently claimed the residential energy credit.

By filing fraudulent tax returns on behalf of thousands of ATAX customers, ATAX generated significant profits.  For example, from 2016 through 2019, ATAX generated at least approximately $15 million in gross revenues.  As the sole owner of ATAX during this period, Alvarez received a large portion of ATAX's net revenues.  (PSR ¶ 14).

Alvarez operated this fraudulent tax scheme for years, together with certain other ATAX employees.  These ATAX employees understood that Alvarez added false information to the tax returns and, at Alvarez's direction, these ATAX employees copied over false information from previous years' tax returns and did not change Alvarez's fraudulent entries in the tax returns when filing those returns with the IRS.  In order to further his scheme and limit scrutiny, Alvarez recruited employees without legal status in the United States. (PSR ¶ 15).  Multiple former ATAX employees confirmed that Alvarez specifically recruited to ATAX and personally trained as tax preparers impressionable, easily intimidated individuals such as one former employee who, before he started at ATAX, had been working as a grocery store cashier, lacked immigration status in the United States, and lacked any college education.

When certain ATAX employees questioned Alvarez about his fraudulent preparation of returns, Alvarez intimidated and threatened these employees to dissuade them from reporting his fraud scheme to authorities.  When ATAX employees failed to carry out Alvarez's fraudulent scheme by removing schedules and other deductions that the customers did not qualify for, Alvarez scolded these employees and made it a policy that ATAX employees could not change Alvarez's fraudulent entries on the customers' tax returns.  (PSR ¶ 15).  Multiple former ATAX employees confirmed that Alvarez intimidated, threatened, and embarrassed subordinates who questioned Alvarez's fraudulent preparation of returns, thereby quashing dissent and reducing the risk of a

whistleblower alerting law enforcement.  If employees complained, Alvarez would punish them by switching their duties from tax preparation to technical support.

One former employee for instance, once serviced a client who was a relative of Alvarez. After the former employee prepared the return, the customer complained about the tax liability and asked to see Alvarez.  When the customer returned, the former employee noticed that Alvarez had added to the return Alvarez's own house as a supposed rental property for the customer.  After the customer left, Alvarez yelled at the former employee that he had "30 years in this industry," that the former employee knew nothing, and that the former employee should not question him (in other words, that Alvarez knew better).  Another former employee frequently reviewed tax returns which Alvarez had worked on which had information that the former employee knew from the customer was simply false.

Another former employee recalled an instance with a client where the former employee removed a Supplemental Income and Loss schedule from a client's return because the client reported that he/she had no tenant.  Alvarez scolded the former employee, noting in sum and substance, "why are you removing it?  You aren't supposed to remove it.  Copy and paste.  That is your job."

Former clients corroborate Alvarez's scheme, recounting waiting many hours until the wee hours of the morning to sit with Alvarez at ATAX.  For example, in 2016, former ATAX customer A.E. sat with Alvarez to finalize his tax return.  Alvarez asked A.E. if anyone pays rent to A.E. at his primary residence; A.E. responded that his daughter, who resided with him, contributed $100 a week.  Alvarez told A.E., falsely, that he could thus include the residence as a rental property, and marked it as such on A.E.'s tax return.

Former ATAX customer S.M. had returns prepared at ATAX for many years.  S.M. never made any mention to Alvarez about any stock holdings; nonetheless, her tax returns indicated $3,000 fraudulent capital gains losses in 2015 and 2016.  S.M. recalled being audited in the past based on tax returns that Alvarez prepared.  S.M. remembered that the audit resulted in approximately $21,000 of adjustments because the returns fraudulently claimed she had a rental property.  S.M. paid all but the last $5,000 of the bill.  Even after S.M. was audited, Alvarez continued to fraudulently include the Schedule E on S.M.'s tax returns in ensuing years.  In addition to fraudulently claiming S.M.'s personal residence as a rental property, Alvarez also fraudulently included S.M.'s daughter as a qualifying relative for the head of household filing status and fraudulently claimed residential energy credits.  The tax loss attributed to the false returns for 2015 through 2019 was $7,349, $9,692, $9,208, $9,675, and 6,733, respectively, totaling $42,657.

Alvarez's former clients are not limited to low-income residents of the Bronx.  For instance, J.L. is a Florida cardiologist.  J.L. has been a client of Alvarez and ATAX since at least 2014.  J.L.'s W2 wages for 2014 were approximately $400,000 and have rapidly increased since then to over $1,000,000.

J.L.'s tax returns for 2017 through 2020 were prepared and filed by Alvarez and resulted in an estimated tax loss of $48,925, $21,577, $65,964, and $82,395 for 2017 through 2020, respectively.  The total loss for 2017 through 2020 is approximately $218,861.  Through counsel, J.L. has admitted to the returns being fraudulent and has filed amended returns along with payments toward the tax liability.  When the Government verifies J.L.'s payment of his tax

liabilities (and any other payments by former Alvarez clients), it will reduce Alvarez's restitution balance.

J.L.'s personal returns also included fraudulent entries consistent with the schemes that Alvarez employed with his other clients, such as fraudulently claiming the head of household filing status and by fraudulently including gifts to charity of $25,362 and $28,900. J.L.'s amended returns, submitted by counsel, no longer included these gifts to charity as deductions. Furthermore, below are May 2019 text messages between Alvarez and J.L. discussing J.L.'s refund amount and the fraudulent gifts to charity/donations.

> **J.L.:** Morning How much refund?
> **Alvarez:** I don't know yet. I will let you know later.
> **Alvarez:** Your federal refund is $24,233
> **J.L.:** Ehhhhh. Can't. Any more?
> **Alvarez:** this year you have 97K in capital gain plus your income went up 200k. With out your investment.
> **J.L.:** ok
> **J.L.:** So 25k is final number for everything?
> **Alvarez:** Yes, I pushed as far a[s] I can
> **J.L.:** Ok. Thanks
> **Alvarez:** I will increase the donations to 28K
> **Alvarez:** You will get $35,289
> **J.L.:** Wow. Ok great. Thanks
> **Alvarez:** is that ok
> **J.L.:** perfect

<u>Obstruction</u>

The schemes operated by Alvarez did not stop at preparing false tax returns. Alvarez recruited to ATAX an employee ("Employee-1") who had been working at a supermarket and lacked legal status in the United States, which Alvarez knew. In order to file tax returns with the IRS, a tax preparer must obtain an identification number from the IRS (called a Preparer Tax Identification Number or "PTIN"). At Alvarez's direction and with his knowledge, beginning in 2015, Employee-1 used the identity of an associate who had lawful status in the United States

8

("Associate-1"), and impersonated Associate-1, with Associate-1's consent, in order to obtain a PTIN. Employee-1 thereafter filed fraudulent tax returns on behalf of ATAX customers using this fraudulently obtained PTIN. (PSR ¶ 16).

On September 26, 2017, an IRS Revenue Agent ("Revenue Agent-1") sent a letter to Associate-1, requesting an interview. Revenue Agent-1's letter was ultimately, however, received by Employee-1, who had been impersonating Associate-1. When alerted by Employee-1 that Revenue Agent-1 was requesting an interview with Associate-1, Alvarez insisted on joining the interview. During the interview, which occurred on October 24, 2017, Employee-1 and Alvarez pretended that Employee-1 was Associate-1. Alvarez also provided Revenue Agent-1 with a power-of-attorney form purportedly signed by Associate-1, stating that Alvarez was acting with power of attorney for Associate-1. During the interview and at Alvarez's direction, Employee-1 repeatedly lied and pretended that he was Associate-1 in order to conceal from Revenue Agent-1 that Alvarez, Employee-1, and ATAX had been submitting fraudulent tax returns using a fraudulently obtained PTIN in the name of Associate-1, even though Associate-1 played no role in preparing these tax returns. Revenue Agent-1 did not learn the truth for years, which impacted her ongoing investigation. (PSR ¶ 17).

### B. Alvarez's Indictment, Guilty Plea, the Guidelines Calculation, and the PSR

On April 10, 2024, a grand jury sitting in this District returned an indictment charging the defendant in eight counts, including: conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371 (Count One); aiding and assisting preparation of a false and fraudulent U.S. individual income tax return, in violation of Title 26, United States Code, Section 7206(2) and Title 18, United States Code, Section 2 (Counts Two through Five); attempting to

9

interfere with administration of internal revenue laws, in violation of Title 26, United States Code, Section 7212(a) and Title 18, United States Code, Section 2 (Count Six); making false statements, in violation of Title 18, United States Code, Sections 1001 and 2 (Count Seven); and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A and 2 (Count Eight).

On December 17, 2024, Alvarez entered a plea of guilty to Counts One and Two of the S1 Superseding Information pursuant to the plea agreement. (Dkt. 29-32). Count One charged Alvarez with conspiracy to defraud and the United States and steal Government funds, in violation of Title 18, United States Code, Section 371, and Count Two charged Alvarez with aiding and assisting preparation of a false and fraudulent U.S. individual income tax return, in violation of Title 26, United States Code, Section 7206(2) and Title 18, United States Code, Section 2 (Count Two).

The plea agreement sets forth the following calculation of the offense level under the United States Sentencing Guidelines (the "Guidelines"):

(1) Pursuant to U.S.S.G. § 2T1.4(a)(1), the base offense level is the level from the Tax Table in U.S.S.G. § 2T4.1 corresponding to the tax loss resulting from the defendant's aid, assistance, procurance, or advice (the "Tax Loss"). Because the parties stipulate that the Tax Loss is $145,000,000.00, the base offense level is 30, pursuant to U.S.S.G. § 2T4.1(M).

(2) Pursuant to U.S.S.G. § 2T1.4(b)(1)(A) and (B), two levels are added because the defendant committed the offense as part of a pattern or scheme from which he derived a substantial portion of his income and the defendant was in the business of preparing or assisting in the preparation of tax returns.

(3) Pursuant to U.S.S.G. § 3C1.1, two levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense.

(4) Pursuant to U.S.S.G. § 3B1.1(a), four levels are added because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

(5) Pursuant to U.S.S.G. § 3E1.1(a) and (b), three levels are removed, for acceptance of responsibility.

Thus, the applicable Guidelines offense level is 35 and the Criminal History Category is I, resulting in a stipulated Guidelines range of 168 to 210 months. However, the statutory maximum sentence of imprisonment is 96 months' imprisonment and so the applicable Guidelines sentence is 96 months' imprisonment. The PSR contains the same Guidelines calculation as that set forth in the plea agreement. (PSR ¶¶ 24-37, p. 24).[1]

The U.S. Probation Office recommends a slight downward variance sentence of 84 months' imprisonment. PSR at 24. The U.S. Probation Office observed:

> [T]he magnitude of the offense conduct cannot be ignored. Alvarez ran a tax fraud scheme that spanned over a decade and deprived the IRS of $145,000,000. Alvarez filed fraudulent tax returns on behalf of thousands of ATAX customers, which allowed him to amass approximately $15 million in gross revenues. It is evident the defendant knew what he was doing was wrong by how he took certain steps to further his scheme and limit scrutiny. Specifically, the defendant intimidated and threatened employees to dissuade them from reporting his fraud scheme to authorities and even went as far to interrupt and obstruct the IRS's investigation when they attempted to interview his employee. When weighing all these factors, it is our belief that a significant custodial sentence is warranted. Tax preparers who falsify deductions, or otherwise seek to fraudulently inflate client refunds need to face significant consequences in order to provide just punishment and deterrence. As such we recommend a total sentence of 84 months' imprisonment, which we believe is sufficient but not greater than necessary, pursuant to the factors outlined in 18 U.S.C. 3553(a).

PSR at 25-26.

---

[1] The Government is not seeking a fine in light of the sworn financial information provided by Alvarez. Consistent with the parties' plea agreement and the PSR, the Court has already entered a forfeiture order of $11,840,400. (Dkt. 31). Likewise, also consistent with the parties' plea agreement and the PSR, the Government will submit a restitution order for $145,000,000 in advance of sentencing. (PSR at 24, 29, ¶¶ 5.m, 20, 87).

## II.    DISCUSSION

### A. <u>Applicable Law</u>

As the Court is aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.  A Guidelines Sentence Would Be Just and Appropriate**

The Government respectfully submits that the Stipulated Guidelines Sentence of 96 months would be sufficient, but not greater than necessary, to serve the purposes of sentencing.  In particular, the gravity of Alvarez's offense, the need to provide just punishment and achieve general deterrence, and the importance of accounting for the devastating tax loss he caused, all justify such a sentence.

**Offense conduct.**  The Stipulated Guidelines Sentence of 96 months is necessary to reflect the nature and circumstances of the offense and to provide just punishment, particularly given the length of the offense conduct and the significant tax loss that Alvarez caused.  Such a sentence also would consider Alvarez's full acceptance of responsibility, as well as his status as a first-time offender, age, and family circumstances.  Indeed, it is because of these factors that the Government exercised its discretion to allow Alvarez to plead guilty to offenses with an eight-year statutory cap, and not additional tax offenses (or aggravated identity theft, which carries a mandatory minimum term of imprisonment), which would result in a higher statutory maximum and Guidelines range than the statutory maximum and Stipulated Guidelines Sentence that the parties agree applies under the plea agreement.

It should go without saying that the offense conduct is serious.  Tax fraud is theft from the pockets of every taxpaying citizen of this nation.  Alvarez's corrosive efforts to "help" his clients harmed us all.  The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."  *Spies v. United*

13

*States*, 317 U.S. 492, 495 (1943).  A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.  As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ."  *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).  More broadly, Alvarez's crimes undermine faith in our government and in its institutions.  It is criminal conduct that can be surprisingly hard to detect.  Alvarez's brazen tax fraud operated at such a large scale that it can create cynicism and breed distrust in the U.S. tax system while penalizing the honest taxpayers who must fill the payment gaps of Alvarez's clients.

The decade-long tax fraud that Alvarez perpetrated cost the U.S. Treasury, and this nation's honest taxpayers, $145 million in actual losses, as well as the interest that would have accumulated on these unpaid taxes over time.  The magnitude of Alvarez's fraud itself warrants the Stipulated Guidelines Sentence.  Moreover, the offense conduct in this case is further aggravated by the manner in which Alvarez carried out his tax fraud scheme.  Alvarez's crimes are not something he simply stumbled into.  To the contrary, they required detailed planning.  Alvarez specifically recruited and personally trained as tax preparers impressionable, easily intimidated workers.  Alvarez leveraged the power imbalance by intimidating and threatening these employees to prolong his crimes.  Alvarez was willing to commit outright fraud.  Through his crimes, he deprived the Government of tax revenue and placed his clients in legal and financial jeopardy.  Alvarez's actions were far from a one-time mistake or a fleeting lapse in judgment.  Time and time again, over the course of a decade, Alvarez made a conscious and deliberate choice to defraud the U.S. Government.  At every turn throughout the years-long scheme (*i.e.*, at the

14

outset, when clients were audited, when Revenue Agent-1 began the IRS's investigation, and as the years went by from 2010 to 2011, all the way to 2020), when presented with the choice of abstaining from further misconduct or doubling and tripling down on it, Alvarez chose the latter, in order to earn more money. This prolonged and serious criminal conduct supports the Stipulated Guidelines Sentence.

**General deterrence.** One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997); *see also Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*; *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

The need for general deterrence is acute in this case; it is essential to reducing the ever-

15

increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance estimates that only 86.9% of individuals are compliant with their tax obligations, leaving a yearly tax gap of approximately $606 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Projections Map," Tax Year 2022, *available at* https://www.irs.gov/statistics/irs-the-tax-gap. This means that hundreds of billions of dollars are lost every year because people like Alvarez—who otherwise fully enjoy the myriad public benefits that the tax system supports— promote and perpetuate the largescale shirking of taxpayers' responsibilities. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence. Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of

16

punishment must be higher to obtain the same level of deterrence.

As the late Judge Weinfeld aptly observed in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under  which the citizens are required to cooperate with the government, to file true and accurate  returns.  I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).  Judge Gardephe echoed this view in a more recent case involving a defendant who utilized an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one.  Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct.  I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.  There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States* v. *Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50); *see also United States* v. *Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); *United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In short, compliance with the Internal Revenue Code will be unattainable if the general

17

public fails to believe that a meaningful term of imprisonment will await flagrantly failing to comply with the tax laws. This country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of status or educational or professional background. And that system of voluntary compliance would be undermined if experienced tax professionals, such as the defendant, come to believe that the most severe sanctions that they will face, in the relatively unlikely case that they are caught cheating on their taxes, are a light sentence, the payment of back taxes, interest, and penalties. Sentencing Alvarez to a significant term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on taxes will be met with serious punishment.

**Unwarranted sentencing disparities.** Finally, the Stipulated Guidelines Sentence of 96 months is appropriate to avoid creating an unwarranted sentencing disparity. As the Second Circuit has explained, "we have repeatedly made clear that 'section 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants.'" *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (quoting *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008)). Here, likely due to the unusually high tax loss caused by Alvarez, the PSR's summary of the U.S. Sentencing Commission's Judiciary Sentencing Information data, which analyzed the sentences imposed on other defendants with the same final offense level, 35, and Criminal History Category, I, as Alvarez over the last five fiscal years (FY2019-2023), indicates that there was an insufficient number of defendants meeting this criteria. (PSR at 22.) But given the importance of eliminating sentencing disparities under 18 U.S.C. § 3553(a)(6), the Government attaches for the Court's consideration a chart of sentences in other tax cases (or cases that had a significant tax component), including

cases with loss amounts that pale in comparison to the loss amount in this case and cases with defendants in a similar age bracket as Alvarez.  (*See* Exh. A (the "Sentencing Chart")); *see also* Chart Riggall, *Ga. Tax Return Fraudster Gets 12 ½ Years In Prison*, Law360 (Feb. 11, 2025), *available at*: https://www.law360.com/articles/2296432/print?section=georgia.   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

Although the Government believes that there is some benefit in having the Court consider sentencings in other tax cases, it is mindful that, at best, such guidance can get the Court only so far.  Needless to say, every case is unique; every individual defendant is unique.  The Government does not mean to suggest otherwise.  The reason for the Government's reference to the other sentences is straightforward: while the Government recognizes that its recommendation in this case calls for a substantial sentence, comparable sentences have been meted out in cases involving other long-running criminal conduct and tax losses.  In fact, as the attached chart shows, it is not uncommon for defendants who are less culpable than Alvarez to receive and serve lengthy sentences of incarceration.

Accordingly, given Alvarez's conduct, the U.S. Treasury's actual losses (and not some far-flung estimate of intended loss) of $145 million, and the sentences imposed in other tax cases, to sentence Alvarez well below the requested sentence would risk creating an unwarranted sentencing disparity.

### III.    CONCLUSION

On the facts here, the Stipulated Guidelines Sentence of 96 months would be appropriate and just.  Such a sentence would recognize the substantial, actual tax loss Alvarez caused of $145

million, avoid minimizing the seriousness of Alvarez's crimes, and send a message to tax preparers and would-be tax evaders that meaningful time in prison—and not merely being asked to pay financial penalties that they may not even have the means to actually pay—is the likely consequence of sustained, long-running tax fraud.[2]  By contrast, a sentence involving minimal jail time would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the tax laws.  To the extent that the Court is inclined to impose a downward variance sentence, the Government submits that a significant incarceratory sentence along the lines of the 84 months recommended by the U.S. Probation Office would be appropriate.

Dated:  New York, New York
        May 22, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney for the
                                        Southern District of New York

                        By:     /s/ _____
                                        David R. Felton
                                        Assistant United States Attorney
                                        Tel:  212-637-2299

cc:     Defense counsel (by ECF)

---

[2] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b).  *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).